IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **THE CYNWYD GROUP, L.L.C.,** a Pennsylvania Limited Liability Company,<br><br>       Plaintiff and Counterclaim Defendant,<br><br>       v.<br><br>**K12 PENNSYLVANIA L.L.C.,** a Delaware Limited Liability Company,<br><br>       Defendant, Counterclaim Plaintiff, and Third Party Plaintiff,<br><br>       v.<br><br>**DR. JUNE BROWN,**<br><br>       Counterclaim / Third Party Defendant,<br><br>       and<br><br>**AGORA CYBER CHARTER SCHOOL,** A Pennsylvania non-profit corporation,<br><br>       Third Party Defendant. | CIVIL ACTION NO. 09-2963<br><br>**JURY TRIAL DEMANDED** |

## DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT, COUNTERCLAIMS AGAINST PLAINTIFF, AND THIRD PARTY COMPLAINT

Defendant, K12 Pennsylvania L.L.C. ("K12"), by and through its undersigned

counsel, responds to Plaintiff Cynwyd Group, L.L.C.'s ("Cynwyd") Complaint, asserts its

Counterclaims against Cynwyd and its owner and alter ego, Dr. June Brown ("Dr. Brown"), and

brings its Third Party Complaint against the Agora Cyber Charter School ("Agora") for the

conduct of its Board of Trustees as follows:

# **INTRODUCTION**

For over a year, K12 has worked through the enormous distractions Cynwyd created and, working virtually alone, has served the Agora Cyber Charter School's ("Agora") students, teachers, and families. K12 continues to do so today, despite Cynwyd's baseless claims, threats, litigation, and intimidation, and a revocation proceeding initiated by the Pennsylvania Department of Education ("PDE") due to Cynwyd's misconduct and the fact that many members of the Agora Board have financial ties to Cynwyd's owner and sole employee, Dr. June Brown. Unlike Cynwyd, which seems to be focused on self-preservation and litigation, K12's present efforts and resources are directed to the upcoming academic year and continuing to provide Agora's students with the best education available.

Cynwyd claims that K12 breached its contract with Cynwyd. Just the opposite is true. Cynwyd failed to provide the programs it promised and has done little for millions of dollars in fees, having subcontracted every obligation of substance to K12. Cynwyd's failure to provide meaningful services is so clear that the PDE investigated Agora and has focused its revocation proceedings on the issue of what, if anything, Dr. Brown has done for Agora. In contrast, the PDE found no fault with K12 in its investigation and K12, with no assistance from Cynwyd, has continued to operate Agora and serve its students successfully.

The significant misconduct by Dr. Brown was abetted by the explicit and complicit cooperation of members of the Agora Board, comprised largely of individuals who now benefit or have benefitted from her financially and whose judgment is clouded by those relationships. The Agora Board enabled Dr. Brown to collect $2,637,073 in fees for little work, and now has authorized the initiation of three additional lawsuits, each with the same object of intimidating the PDE into approving payments to Cynwyd of an additional $2 million in fees.

The Agora Board's relationship with Dr. Brown appears so strong that it is willing to jeopardize the education of thousands of students by having rejected the following offer: if the Board were to replace its members with individuals who have no relationship with Dr. Brown and sever Agora's contractual relationship with Dr. Brown, the PDE would end the revocation proceedings. There can be no explanation for the Agora Board's refusal to agree to these terms other than that it is so dominated by or linked to Dr. Brown, and she is so determined to wring every last dollar out of Agora, that they and she will hold 4,400 students and their families hostage and put the school at risk. This is exactly contrary to the Agora Board's mission, which is, and should be, to provide Agora's students with the education they seek.

Even with the substantial distraction that Cynwyd's conduct has created, K12 has kept its focus on its mission of educating Agora's children, training its teachers, providing operational and financial services, and preparing the school for the upcoming academic year. K12 did not commence this suit, but now that Cynwyd has deliberately attacked and dragged K12 into Court as part of a litigation strategy against the PDE, K12 has no choice but to defend itself by demonstrating how well its curriculum has performed at Agora, the breadth of the services it – not Cynwyd – has provided and continues to provide, and the damage Dr. Brown's pattern of threats and intimidation has caused. Several months ago, Dr. Brown responded to Agora parents' inquiries about Cynwyd and Agora by suing them for defamation and tens of thousands of dollars in alleged damages. Similarly, when the PDE and Department of Justice began investigating her, Dr. Brown demanded that K12 present a "united front" with her and threatened that if K12 refused, K12 would "go down for this." She and the Agora Board have followed through on this threat, each suing K12 in different courts and disparaging K12 in papers filed in lawsuits against the PDE. Unfortunately for Dr. Brown and the Agora Board, a long trail

of documents conclusively shows that it is Cynwyd and the Agora Board, not K12, that have violated Pennsylvania law, and it is K12, not Cynwyd, that is entitled to substantial damages. K12 has fulfilled its contractual obligations and provided excellent educational services to the 4,400 students it educates at Agora, and the record more than supports that unlike Cynwyd, K12 has earned every dollar it has received by providing an outstanding education for Agora's students, just as it does for the 56,000 students in schools that K12 manages in 20 other states. K12 now submits its Answer, Counterclaims, and Third Party Complaint to set the record straight.

## PARTIES

1.     Admitted, upon information and belief.

2.     Admitted in part, denied in part.  It is denied that K12's principal place of business is McLean, Virginia.  K12's principal place of business is Herndon, Virginia.  The remainder of the allegations contained in paragraph 2 of the Complaint are admitted.

## JURISDICTION AND VENUE

3.     Denied as conclusions of law to which no response is required.

4.     Denied as conclusions of law to which no response is required.

## STATEMENT OF FACTS

5.     Admitted.

6.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

4

7.      It is admitted that Dr. Brown is the founder of three brick and mortar charter schools in Philadelphia.  According to 2007-2008 Annual Charter Reports filed with the PDE, Dr. Brown is the CEO of Laboratory Charter School and Ad Prima Charter School.  K12 lacks knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 7 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

8.      K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

9.      K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

10.      K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

11.      Admitted.  (See the PDE's 1/28/2005 Order and Letter Denying Initial Application, a true and correct copy of which is attached hereto as Exhibit 1.)

12.      K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

13.      Admitted in part, denied in part.  It is admitted that the PDE granted Agora a charter to operate a cyber charter school on June 29, 2005.  With respect to the remaining allegations contained in paragraph 13 of the Complaint, K12 lacks knowledge or information

sufficient to form a belief as to the truth of those allegations, and therefore denies those allegations and demands strict proof thereof at trial.

14. Denied as a conclusion of law to which no response is required.

15. Admitted. By way of further response, Agora also receives federal money in the form of Title I and Individuals with Disabilities Education Act ("IDEA") funds.

16. K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

17. K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

18. K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

19. K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

20. K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 of the Complaint and therefore denies the same and demands strict proof thereof at trial. By way of further response, beginning in August 2006 and pursuant to the Cynwyd/K12 Agreement, K12 administrators repeatedly requested from Cynwyd copies of Agora's Board-approved policies, meeting schedules, and meeting minutes.

Despite K12's numerous requests, Cynwyd never provided K12 with copies of the requested documents.

K12 has reviewed a purported copy of the July 13, 2005 Board meeting minutes, which were posted on the Agora Parent Organization's website (at www.agoraresources.net/ BoardOfTrustees.htm) and made public for the first time by an Agora parent who received the information pursuant to a Right to Know Request on or about October 15, 2008. (A true and correct copy of the July 13, 2005 meeting minutes posted on the Agora Parent Organization's website is attached hereto as Exhibit 2.) By way of background, on July 13, 2008, Gladys S. Stefany[1] wrote to Board President Howard Lebofsky requesting "copies of all minutes from the first meeting after receiving charter approval from the PDE through the most recently held meeting." (A true and correct copy of the 7/18/2008 Ltr. is attached hereto as Exhibit 3.) By letter dated July 18, 2008, Mr. Lebofsky advised Mr. Stefany that he had directed her request to Agora's designated Open Records Officer, Dr. Brown. (A true and correct copy of the 7/18/08 email is attached hereto as Exhibit 4.) Three months later, on or about October 15, 2008, Dr. Brown provided Ms. Stefany with purported copies of the requested minutes, which Ms. Stefany then posted to the APO's website.

To the extent that the allegations contained in paragraph 20 of the Complaint are reflected in the July 13, 2005 Board minutes provided to the Agora parent, K12 lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies the same and demands strict proof thereof at trial. K12 is unaware of whether the meeting

---

[1]      Ms. Stefany is an Agora parent and current defendant in a civil action filed by Cynwyd and Dr. Brown in the Montgomery County Court of Common Pleas. Dr. Brown and Cynwyd allege that Ms. Stefany and six other parents defamed them and demand damages in excess of $50,000. (*See infra* paragraph 173.)

occurred and, if it did, whether the posted minutes, which are not signed or duly executed, are true and correct copies of the meeting minutes. K12's concern regarding the accuracy and authenticity of these and other Board minutes arises in part from the fact that, since May 2006, Agora has compensated Vivienne Crawford, an attorney who has served on the Board of one or more charter schools affiliated or associated with Dr. Brown and who occasionally is listed in Agora's records as a Board member, $100 an hour to review and revise certain Board minutes after the meetings occurred. Specifically, K12 received invoices dated June 27, 2008, February 23, 2008 and March 12, 2009, totaling $13,850, ostensibly for 138.5 hours of work, for "Board Meeting recording & transcriptions services" from Ms. Crawford who, based on the posted meeting minutes, only attended five Board meetings in 2006. (See Crawford invoices, true and correct copies of which are collectively attached hereto as Exhibit 5.) Moreover, and by way of example, significant differences exist between the December 18, 2007 Board meeting minutes, which were approved and distributed at the February 19, 2008 Board meeting, and the December 18, 2007 Board meeting minutes provided to Ms. Stefany and posted at www.agoraresources.net/BoardOfTrustees.htm. Specifically, the two versions of the December 18, 2007 Board minutes differ in the following respects:

a)    The version distributed at the February 19, 2008 meeting ("February 19, 2008 version") did not reflect the attendance of Brien Gardiner[2]; the version posted on the parents' website (the "posted version") did;

b)    The February 19, 2008 version reflected that Anthony Smoot was not present at the Board meeting; the posted version reflected that Mr. Smoot was present in an *ex officio* capacity and distributed a financial report;

---

2    Until approximately May 2008, when Mr. Gardiner's conduct at the Philadelphia Academy Charter School became the subject of an investigation, Mr. Gardiner was Dr. Brown's partner in Cynwyd.

c)    The February 19, 2008 version identified Dr. Brown only as an *ex officio* Board member; the posted version identified Arnita Medley, Dr. Brown, and Mr. Gardiner as *ex officio* members of the Board;

d)    The February 19, 2008 version did not contain any reference to Mr. Gardiner presenting a resolution for K12 to rent the Devon Site for a monthly rental of $25,000; the posted version states Mr. Gardiner presented this resolution;

e)    The February 19, 2008 version reflects the presence of two new Board members, Juaria Jenkins-Shelton and Dr. Wil Elliot; the posted version does not reflect the presence of any new members of the Board; and

f)    The February 19, 2008 version states that the Devon building is owned by the "Kenwood Group,"; the posted version makes no mention of "Kenwood" or Cynwyd.[3]

(True and correct copies of the conflicting meeting minutes are collectively attached hereto as Exhibit 6.)  In addition, the minutes for the alleged May 6, 2006 special Board meeting, wherein the Board voted to contract with Cynwyd, were not provided to Ms. Stefany pursuant to her Right to Know Request.  (A true and correct copy of the 5/6/2006 meeting minutes provided to the PDE are attached hereto as Exhibit 7.)  These meeting minutes, however, were produced by Dr. Brown to the PDE and LECS auditors during their visit to Agora on March 11, 2009, albeit with caveats and handwritten edits.  As Dr. Brown stated in her cover letter:

> I certify herewith, to the best of my ability to recall, that the enclosed documents submitted to you are copies of the complete set of minutes adopted by the Board of the Agora Cyber Charter School from the period beginning with the issuance of the charter to the present.  Please note that some of the members listed are ex

---

3    K12 has cooperated fully with all PDE requests for information, including all information described herein.  Indeed, because of K12's cooperation with the PDE, Agora, in the federal lawsuit it filed against the PDE and the Pennsylvania Office of the Budget, has alleged that K12 has engaged in a civil conspiracy with PDE.  While not a defendant in that action, K12 vigorously denies that its cooperation with PDE or any other governmental agency is part of a conspiracy or for any other improper purpose.  To the contrary, K12 has at all times honored it obligation to be responsive to requests from state regulatory authorities.

officio members whose purpose was to provide guidance and
technical support to the Founding Board and to the Agora Board.

(A true and correct copy of the 3/11/2009 Ltr. and accompanying Board minutes are attached

hereto as Exhibit 8.)  Finally, in connection with the revocation proceedings, the Agora Board's

counsel provided the PDE's counsel with special Board meeting minutes of June 2, 2007 and

November 19, 2007, and Board meeting minutes for June 16, 2008.  (A true and correct copy of

the 6/2/2007, 11/19/2007 and 6/16/2008 minutes produced to PDE are attached hereto as

Exhibits 9, 10, and 11.)  These minutes were not produced to Ms. Stefany pursuant to her Right

to Know Request or to the PDE and LECS during their visit to Agora on March 11, 2009.

      21.     K12 repeats and restates its response to paragraph 20 of the Complaint as

if set forth fully herein.

      22.     Admitted in part, denied in part.  It is admitted that K12 is well known in

the cyber education field and that Dr. Brown recommended K12 to the Agora Board.  It is further

admitted that Agora utilized some of K12's curriculum during its 2005-2006 pilot program ("the

Pilot Program").  K12 lacks knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in paragraph 22 of the Complaint and therefore denies the same and

demands strict proof thereof at trial.  By way of further response, despite repeated requests by

K12, Agora's former auditor, and the PDE, K12 has never received a copy of the financial

records for the Pilot Program.  In fact, Agora's former auditor, Siegel & Drossner P.C., advised

K12 that it is unable to certify its audit of the 2006-2007 school year due to Dr. Brown's failure

to provide them with the financial records for the Pilot Program.  Based on the scant

documentation Dr. Brown provided to K12 regarding the Pilot Program, it appears that the Pilot

Program consisted of 20 to 22 students in grades K-8, most of whom withdrew from Agora

during the first year.

23.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

24.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

25.     Admitted.  By way of further response, K12 respectfully refers the Court to footnote 2.

26.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Complaint and therefore denies the same and demands strict proof thereof at trial.  By way of further response, and consistent with many of Cynwyd's allegations in the Complaint, the allegations in paragraph 26 appear to include quotations from Board meeting minutes that are not attached to the Complaint.  To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

27.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

28.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 of the Complaint and therefore denies the same and demands strict proof thereof at trial.  By way of further response, the allegations in paragraph 28 appear to be based upon Board meeting minutes that are not attached to the Complaint.  To the

extent that Cynwyd purports to rely on Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

29.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

30.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 of the Complaint and therefore denies the same and demands strict proof thereof at trial.  By way of further response, the allegations in paragraph 30 appear to include quotations from Board meeting minutes that are not attached to the Complaint. To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

31.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 of the Complaint and therefore denies the same and demands strict proof thereof at trial.  By way of further response, the allegations in paragraph 31 appear to include quotations from Board meeting minutes that are not attached to the Complaint. To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

32.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 of the Complaint and therefore denies the same and demands strict proof thereof at trial.  By way of further response, the allegations in paragraph 32

appear to include quotations from Board meeting minutes that are not attached to the Complaint. To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

33.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 of the Complaint and therefore denies the same and demands strict proof thereof at trial. By way of further response, the allegations in paragraph 33 appear to include quotations from Board meeting minutes that are not attached to the Complaint. To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

34.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 of the Complaint and therefore denies the same and demands strict proof thereof at trial. By way of further response, the allegations in paragraph 34 appear to include quotations from Board meeting minutes that are not attached to the Complaint. To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

35.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35 of the Complaint and therefore denies the same and demands strict proof thereof at trial. By way of further response, the allegations in paragraph 35 appear to include quotations from Board meeting minutes that are not attached to the Complaint. To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its

concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

36.    K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 of the Complaint and therefore denies the same and demands strict proof thereof at trial. By way of further response, the allegations in paragraph 36 appear to include quotations from Board meeting minutes that are not attached to the Complaint. To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

37.    K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 of the Complaint and therefore denies the same and demands strict proof thereof at trial. By way of further response, despite repeated requests, K12 never received an executed copy of the Agora/Cynwyd Agreement from Cynwyd. After repeated requests, Cynwyd provided K12 with an unsigned copy of the Agora/Cynwyd Agreement dated May 30, 2006. (A true and correct copy of the 5/30/06 agreement is attached hereto as Exhibit 12.) In contrast, the Agora/Cynwyd Agreement attached to the Complaint is dated May 10, 2006.

38.    With respect to the allegations made in paragraph 38 of the Complaint, K12 respectfully refers the Court to the Agora/Cynwyd Agreement for the contents thereof. By way of further response, with two exceptions, Cynwyd subcontracted to K12 each and every one of the services it contracted to provide to Agora under the Agora/Cynwyd Management Agreement. Specifically, Cynwyd retained responsibility only for securing Agora's facility and overseeing K12's administration of services to Agora. (Compare the Agora/Cynwyd

Management Agreement, a copy of which is attached to the Complaint as Exhibit A, with the Cynwyd/K12 Agreement, a copy of which is attached to the Complaint as Exhibit B.)

39. With respect to the allegations made in paragraph 39 of the Complaint, K12 respectfully refers the Court to the Agora/Cynwyd Agreement for the contents thereof. To the extent the allegations set forth in paragraph 39 are inconsistent with the Agora/Cynwyd Agreement, they are denied. By way of further response, K12 incorporates its response to paragraph 38 of the Complaint.

40. With respect to the allegations made in paragraph 40 of the Complaint, K12 respectfully refers the Court to the Agora/Cynwyd Agreement for the contents thereof. To the extent the allegations set forth in paragraph 40 of the Complaint are inconsistent with the Management Agreement, they are denied. By way of further response, K12 incorporates its response to paragraph 38 of the Complaint.

41. With respect to the allegations made in paragraph 41 of the Complaint, K12 respectfully refers the Court to the Agora/Cynwyd Agreement for the contents thereof. To the extent the allegations set forth in paragraph 41 of the Complaint are inconsistent with the Management Agreement, they are denied. By way of further response, K12 incorporates its response to paragraph 38 of the Complaint.

42. With respect to the allegations made in paragraph 42 of the Complaint, K12 respectfully refers the Court to the Agora/Cynwyd Agreement for the contents thereof. To the extent the allegations set forth in paragraph 42 of the Complaint are inconsistent with the Management Agreement, they are denied.

43. With respect to the allegations made in paragraph 43 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the

extent the allegations contained in paragraph 43 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

44.     With respect to the allegations made in paragraph 44 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof.  To the extent allegations contained in paragraph 44 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

45.     With respect to the allegations made in paragraph 45 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof.  To the extent the allegations set forth in paragraph 45 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

46.     With respect to the allegations made in paragraph 46 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof.  To the extent the allegations set forth in paragraph 46 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

47.     With respect to the allegations made in paragraph 47 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof.  To the extent the allegations set forth in paragraph 47 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

48.     With respect to the allegations made in paragraph 48 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof.  To the extent the allegations set forth in paragraph 48 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.  By way of further response, upon information and belief, Cynwyd has not proposed or implemented any programs, curriculum, or

teaching methodologies for Agora's pre-school and special education students with cognitive disabilities.

49. Admitted in part, denied in part. K12 admits that the Management Agreement gives Cynwyd broad responsibility for overseeing the financial and administrative management of Agora. K12 also admits that, under Section 2.02 of the Cynwyd/K12 Agreement, it is responsible for providing administrative services such as personnel management; business administration; day-to-day management; and budgeting and financial reporting. The remaining allegations contained in paragraph 49 of the Complaint are denied. By way of further response, with only two exceptions, Cynwyd subcontracted to K12 each and every one of the services it contracted to provide to Agora under the Management Agreement. Specifically, Cynwyd retained responsibility for securing Agora's facility and overseeing K12's administration of services to Agora.

50. With respect to the allegations made in paragraph 50 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations in paragraph 50 are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

51. With respect to the allegations made in paragraph 51 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent that the allegations in paragraph 51 are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied. By way of further response, K12 has provided Cynwyd with detailed financial reports, in the manner and form that Cynwyd and/or the Board requested, since the inception of the contract. In fact, K12 has provided Cynwyd with detailed financial reports with more frequency than required by the Cynwyd/K12 Agreement. Specifically, K12 provided

Cynwyd with financial reports on August 11, 2006; September 18, 2006; January 9, 2007; November 30, 2007; January 31, 2008; February 29, 2008; March 31, 2008; May 31, 2008; September 30, 2008; November 3, 2008; December 31, 2008; February 28, 2009; and May 31, 2009.

52.     With respect to the allegations made in paragraph 52 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 52 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

53.     With respect to the allegations made in paragraph 53 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 53 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

54.     With respect to the allegations made in paragraph 54 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 54 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

55.     With respect to the allegations made in paragraph 55 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 55 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

56.     With respect to the allegations made in paragraph 56 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the

extent the allegations set forth in paragraph 56 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

57. With respect to the allegations made in paragraph 57 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 57 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

58. With respect to the allegations made in paragraph 58 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 58 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

59. With respect to the allegations made in paragraph 59 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 59 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

60. With respect to the allegations made in paragraph 60 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 60 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

61. With respect to the allegations made in paragraph 61 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 61 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied. By way of further response, under Section 5.04 of the Cynwyd/K12 Agreement, any obligation K12 may have to advance funds for Charter

School expenses are subject to the limitations set forth in Sections 2.02(d), 2.05(a), 5.01(h)(iii), 5.03(b), and 5.04(a) of the Cynwyd/K12 Agreement.

62.     With respect to the allegations made in paragraph 62 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 62 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

63.     With respect to the allegations made in paragraph 63 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 63 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

64.     With respect to the allegations made in paragraph 64 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 64 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

65.     With respect to the allegations made in paragraph 65 of the Complaint, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 65 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

66.     With respect to the allegations contained in paragraph 66 of the Complaint, K12 respectfully refers the Court to the press release for the contents thereof. To the extent the allegations in paragraph 66 are inconsistent with the press release, the allegations are denied.

67.     Denied.  To the contrary, K12 has not breached its obligations under the Cynwyd/K12 Agreement or to the Agora community in any way.  By way of further response, the allegations in paragraph 67 appear to include quotations from Board meeting minutes that are not attached to the Complaint.  To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

Further, and contrary to the allegations of paragraph 67 of the Complaint, neither Cynwyd nor the Board ever advised K12 of, or complained to K12 about, the alleged contractual violations stated in paragraph 67 of the Complaint.  K12 first learned of these alleged complaints on or about October 15, 2008, after Ms. Stefany posted a purported copy of the December 21, 2006 meeting minutes, obtained pursuant to a Right to Know Request, at www.agoraresources.net/BoardOfTrustees.htm.

68.     Denied.  By way of further response, and as set forth in response to paragraph 67 of the Complaint, K12 was never advised of the alleged "problem" Cynwyd now claims K12 had not remedied.  On the contrary, between December 21, 2006 and December 18, 2007, K12 did not receive any complaints from Cynwyd regarding any "problems" or alleged violations of the Cynwyd/K12 Agreement.

Finally, the allegations in paragraph 68 appear to be based upon Board meeting minutes that are not attached to the Complaint.  To the extent that Cynwyd purports to rely on Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

69.     Admitted only that Ms. Williams attended the Agora Board meeting on February 19, 2008, to discuss perceived "communication issues" and that the Agora Board stated several concerns.  All remaining allegations in paragraph 69 of the Complaint, including that any "communication issues" were the result of any fault of K12, are denied.

70.     Admitted only that Board member Anthony Smoot, who upon information and belief and as reported by the *Philadelphia Inquirer* is employed as the business manager of one or more charter schools associated or affiliated with Dr. Brown, inquired regarding his belief that Mr. Corcoran failed to provide financial reports to the Board.  K12, however, denies that Mr. Corcoran or K12 failed to make the required financial reports.  To the contrary, as Ms. Williams reminded Mr. Smoot and advised the Board at the February 19, 2008 meeting, and at Dr. Brown's direction, Mr. Corcoran provided the required financial reports directly to Mr. Smoot even, on several occasions, hand-delivering these reports to Mr. Smoot.  In response, and equally incorrectly, Mr. Smoot stated that Mr. Corcoran had been invited to every Board meeting.  Ms. Williams advised Mr. Smoot and the Board that, until December 2007, K12 had never been advised of a single Board meeting and had not been invited to a Board meeting until the February 2008 Board meeting.  Nevertheless, and to fully and completely address Mr. Smoot's and the Board's concerns, Ms. Williams suggested setting up regular meetings with Mr. Smoot, but he declined.  Ms. Williams further requested that Mr. Smoot contact her directly if he had concerns regarding Mr. Corcoran's performance and that she would address any needs immediately.  Dr. Brown then stated that Mr. Corcoran was doing his best but needed additional assistance.  As a result, the Board voted to provide help for Mr. Corcoran once they further researched the issue and determined whether the need existed.  Following the meeting, Ms. Williams did not receive any further complaints about Mr. Corcoran from Dr. Brown or the

Board, and, upon information and belief, the Board did not conduct an investigation as to whether Mr. Corcoran required additional support.

71. Admitted only that the Board discussed concerns regarding hiring during the February 19, 2008 meeting, but all remaining allegations contained in paragraph 71 of the Complaint are denied. By way of further response, the allegations in paragraph 71 appear to be based upon Board meeting minutes that are not attached to the Complaint. To the extent that Cynwyd purports to rely on Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

72. K12 lacks knowledge or information sufficient to form a belief as to what the Agora Board "attempted" at the February 19, 2008, meeting, and therefore denies those allegations and demands strict proof thereof at trial. With respect to the conversation that occurred between K12, Dr. Brown, and the Board, admitted only that Dr. Brown suggested an online methods assessment for Agora students and Ms. Williams agreed to review the assessments Dr. Brown suggested. All remaining allegations in paragraph 72 of the Complaint are denied. By way of further answer, following the February 19, 2008 Board meeting, Ms. Williams researched the online methods assessment test suggested by Dr. Brown and discussed those assessments with Mr. Gardiner during their April 4, 2008 meeting. At that meeting, Mr. Gardiner and Ms. Williams agreed that the assessment was incompatible with K12's platform.

73. Denied. Board Member Edward Caruso inquired with Ms. Williams about capping Agora's enrollment as a result of the Board's perception that Agora's students were not demonstrating an adequate level of achievement. Ms. Williams explained that, as a public school, Agora was required to accept any student who complied with state mandated enrollment

procedures and the school's policies. Ms. Williams further explained that, in April of each school year, K12 closes enrollment for the current school year and opens enrollment for the next school year because it is academically and fiscally irresponsible to enroll students in May and June as typically students who try to transfer this late in the school year are looking to be promoted by a new school program. Ms. Williams then stated that Agora could establish an enrollment cap, and that this was a Board decision. Following this suggestion, Dr. Brown interjected and told the Board that it was unnecessary to cap enrollment. As a result, the Board immediately abandoned Ms. Williams' suggestion. Similarly, and despite Cynwyd's claim that K12 was solely focused on growing Agora's enrollment, Cynwyd and the Board have consistently rejected the imposition of enrollment caps for Agora. See infra paragraph 84.

74. Denied. By way of further response, K12 incorporates its response to paragraph 73 of the Complaint. Further, the quotations and allegations in paragraph 74 appear to be based upon Board meeting minutes that are not attached to the Complaint. To the extent that Cynwyd purports to rely on Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

75. Denied. By way of further response, after a diligent review of its records, K12 has been unable to locate any record of receiving the April 21, 2008 letter described in paragraph 76 of the Complaint. By way of further response, K12 has reviewed an unsigned copy of the April 21, 2008 letter provided by the Agora Board to the PDE in connection with the revocation proceedings. (See 4/21/2008 Ltr. produced to the PDE, a true and correct copy of which is attached hereto as Exhibit 13). K12 also denies that it received a copy of the unsigned version of the April 21, 2008 letter.

76.     Denied.  By way of further response, after a diligent review of its records, K12 has been unable to locate any record of receiving the April 21, 2008 letter described in paragraph 76 of the Complaint.  By way of further response, K12 has reviewed an unsigned copy of the April 21, 2008 letter provided by the Agora Board to the PDE in connection with the revocation proceedings.  (See Exhibit 13.)  K12 also denies that it received a copy of the unsigned version of the April 21, 2008 letter.

77.     K12 lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77 of the Complaint and therefore denies the same and demands strict proof thereof at trial.

By way of further response, K12 is unaware of a Board meeting that occurred on April 21, 2008.  On November 16, 2007, Dr. Brown advised K12 that Board meetings were held on the third Tuesday of the month, every other month, on even months only, and not in the summer.  Accordingly, the next scheduled Board meeting following the February 19, 2008 meeting would have occurred on April 15, 2008.  Indeed, in an effort to follow up with Dr. Brown and the Board regarding the concerns first raised to K12 at the February 19, 2008 Board meeting, Susan Stagner, K12's Regional Vice President for School Services, traveled from Ohio to Pennsylvania to attend the April 15, 2008 Board meeting.  On April 15, 2008, Dr. Brown advised Ms. Williams that the meeting had been cancelled, but did not advise her that the meeting had been rescheduled for April 21, 2008, or any other date.

Following the February 19, 2008 Board meeting, Mr. Gardiner committed to meeting with Ms. Williams on a weekly basis to discuss ongoing issues regarding Agora.  Ms. Williams met with Mr. Gardiner, in person or by phone, on March 7, 2008, March 28, 2008, April 4, 2008, and April 24, 2008.  Mr. Gardiner did not raise any complaints or issues with respect to K12's performance during these meetings.  At Mr. Gardiner's request, Ms. Williams

provided him with copies of her notes from their March 28, 2008 and April 4, 2008 meetings. (True and correct copies of the 3/28/08 and 4/4/08 notes are attached hereto as Exhibits 14 and 15.) Mr. Gardiner did not provide Ms. Williams with any comments or corrections regarding her notes.

Finally, the allegations in paragraph 77 appear to be based upon Board meeting minutes that are not attached to the Complaint. To the extent that Cynwyd purports to rely on Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint. In fact, K12 has reviewed a purported copy of the April 21, 2008 minutes, which were posted at www.agoraresources.net/BoardOfTrustees.htm, and has identified at least one error. Under the "finance" section, the posted minutes state as follows:

> Mr. Smoot: Board members should send me questions to forward to Kevin Cochran [sic] of K-12. At the last meeting the Board requested that Kevin Cochran [sic]be contacted to attend an upcoming Board meeting to provide information concerning financing. Kevin Cochran [sic] has been away often as a result of being in the military reserves. He has been asked to attend Board meetings so that all questions related to finance can be addressed immediately.

(A true and correct copy of the posted 4/21/2008 minutes are attached hereto as Exhibit 16.) To the contrary, Mr. Corcoran was never asked by Cynwyd or any Board member to attend a Board meeting.

78.     Admitted in part, denied in part. It is admitted only that Ms. Williams attended the June 16, 2008 Board meeting. By way of further response, Ms. Stagner also attended the meeting. Ms. Williams provided the Board with a comprehensive report that included reports from all academic departments and regarding Agora's financials, operations, community, and personnel. In addition, Ms. Williams produced teacher resumes, a draft of the school calendar, an updated attendance/truancy policy, a new salary scale, returning teachers'

contracts, and letters of intent for new hires. The remaining allegations contained in paragraph 78 of the Complaint are denied. To the contrary, following the February 19, 2008 Board meeting, K12 ceased all hiring for the academic year and did not hire additional staff without Dr. Brown's approval. Further, and contrary to Cynwyd's and the Board's unwarranted criticism of K12 with respect to hiring, K12 routinely provided Cynwyd with copies of resumes by hand-delivery, email, and fax but received no responses.

79. Denied. No discussion regarding Adequate Yearly Progress ("AYP"), or K12 enrollment practices occurred in K12's presence at the June 16, 2008 Board meeting. By way of further response, K12 has not received a copy of the minutes from the June 16, 2008 Board meeting. These minutes were not approved and distributed at the subsequent Board meeting held on November 3, 2008. In addition, Dr. Brown failed to provide a copy of the June 16, 2008 meeting minutes to Ms. Williams, despite her written request for the minutes by email dated June 25, 2008. (A true and correct copy of Ms. Williams' 6/25/2008 email is attached hereto as Exhibit 17.)

80. Denied. The November 3, 2008 Board meeting was the first time at Dr. Brown and the Board discussed Agora's 2007-2008 AYP results with K12. By way of further response, each year, the federal No Child Left Behind Act requires states to determine annually whether schools and districts in Pennsylvania make AYP. Accordingly, all students across the Commonwealth in grades 3-8 and 11 take the Pennsylvania System of School Assessment ("PSSA") between mid-February and mid-March. The PSSA measures how well students have achieved in reading and mathematics according to Pennsylvania's academic standards. By using these standards, educators, parents, and administrators can evaluate their students' strengths and

weaknesses to increase students' achievement scores. The PSSA results allow schools and districts to evaluate their students' progress to make full proficiency a reality.

For the 2007-2008 academic year, thirty-one percent (31%) of Pennsylvania schools did not achieve AYP. Given the myriad of challenges cyber schools like Agora confront, particularly where students enter the program behind grade level and are new to non-classroom settings, K12 was proud and encouraged that Agora achieved 20 of its 23 AYP targets. As required under Agora's PDE-approved School Improvement Plan, Ms. Williams drafted a letter to Agora's parents advising them of the 2007-2008 PSSA results and the strategies K12 implemented for the 2008-2009 school year to ensure academic growth for all students. By email dated September 15, 2008, Ms. Williams provided Dr. Brown with a draft letter for parents and asked her for her feedback. (A true and correct copy of the 9/15/2008 email is attached hereto as Exhibit 18.) Ms. Williams followed up with Dr. Brown and again asked for feedback, but Dr. Brown never responded.

81. Admitted only that Dr. Brown made the representations set forth in paragraph 81 of the Complaint at the November 3, 2008 Board meeting, but denied that Dr. Brown's statements were based in fact. Indeed, and by way of further response, the allegations contained in paragraph 81 of the Complaint demonstrate how little Dr. Brown understands about public school enrollment requirements. Under Pennsylvania law, every child of school age who is a resident of a Pennsylvania school district is entitled to a public school education. (See PDE's Basic Education Circular ("BEC") Enrollment of Student, available at www.pde.state.pa.us./k.12, and a true and correct copy of which is attached hereto as Exhibit 19.) A child should be permitted to attend school on the next school day after the day on which the child is presented for enrollment, and in all cases within five (5) business days of the school

district's receipts of the required documentation. (Id.) The four mandatory items that must be presented before enrolling the child and allowing the child to attend school are: (1) proof of the child's age; (2) immunizations required by law; (3) proof of residency; and (4) a parent registration statement. (Id.) Although school districts and charter schools may seek information from families in addition to the four mandatory items listed above, they may not require it as a condition of enrolling or admitting a child and they may not delay a child's enrollment or attendance until these documents are provided. (Id.) Thus, under Pennsylvania law, a school district or cyber school must enroll a student regardless of receipt of records from the previous districts.

In conformance with Pennsylvania law, K12 does not screen enrollees or require them to provide any information in addition to the four state-mandated items listed above before enrolling and attending class. As required under Pennsylvania law, upon enrollment, K12 requests academic records from students' home school districts. While school districts are required to provide these records within 10 days, this rarely happens. Accordingly, K12 must place each new student into a grade before receiving the student's academic records and places each new student in a grade based on the child's age and information provided by the child's family regarding the last grade completed. Following enrollment, K12 administers an initial assessment test for new students. If a new student's performance on K12's initial assessment reveals that he or she is not performing at the assigned grade level, K12 will adjust the student's curriculum to provide the additional support the student needs, but K12 typically honors the sending school district's promotion of the student and focuses its efforts on remediation to correct instructional gaps.

In or around October 2008, Dr. Brown visited Agora and demanded the files of 114 of the approximately 800 students residing in Philadelphia. After reviewing these files, Dr. Brown claimed that they were deficient but did not specify the alleged deficiencies.

Further, the fact that a student misses AYP does not indicate that the student was placed in the wrong grade. As K12 has repeatedly tried to explain to Dr. Brown and the Agora Board, Agora, like other cyber charters, is confronted with the particular challenge that many of its students were underperforming and underserved in their previous school districts and are already behind once they enroll in Agora. First-year students admitted to Agora before September have five months to catch up in time for PSSAs administered in March. While this challenge frequently is too great for first-year students to demonstrate their aptitude on the PSSAs, students who have been working with the K12 curriculum for at least two years demonstrate significant improvement over their first-year PSSA grades, and this improvement is even greater in the students' third and fourth years. As a result, and as K12 has repeatedly explained to Dr. Brown and the Agora Board and demonstrated through statistics based on the other 56,000 students K12 serves, test scores, viewed in isolation, are an inappropriate measure of achievement and fail to capture the true picture of Agora's progress and success.

Finally, schools that do not make AYP are required to meet with their respective Intermediate Units to review the School Improvement Plans ("SIP") prior to submitting them to the PDE. In direct contradiction of Cynwyd's allegations that it provided "critical and essential services" and was concerned with improving Agora's AYP, Dr. Brown failed to attend the SIP meeting with the PDE, despite her promise to do so and the receipt of a reminder from K12. Instead, K12 employees Anita Fiel and Julie Schumacher attended on behalf of Agora.

82.     It is admitted only that Howard Lebofsky, then the Board's President, made statements at the meeting regarding Agora's and Cynwyd's abilities to exercise their contractual rights. All remaining allegations in paragraph 82 of the Complaint are denied. K12 has not received a copy of the November 3, 2008 minutes, as they were not approved and distributed at the following Board meeting. To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

83.     It is admitted only that the Board voted that K12 was to provide written assurances within two weeks of changes to be implemented to improve Agora's student achievement. All remaining allegations in paragraph 83 of the Complaint are denied. K12 has not received a copy of the November 3, 2008 minutes, as they were not approved and distributed at the following Board meeting. To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint. By way of further response, despite K12's repeated requests, neither Cynwyd nor the Board provided K12 with a copy of the Board-approved student retention policy. To date, and despite several subsequent requests by K12, Cynwyd has failed to provide K12 with a copy of its retention policy.

84.     It is admitted only that the Board voted that if Cynwyd did not obtain a written plan for improvement by K12, Cynwyd would be instructed to inform K12 that it would be prohibited from recruiting or admitting any additional students, and that Mr. Lebofsky recommended that Cynwyd terminate its contractual relationship with K12 if it did not comply

with the demands. All remaining allegations in paragraph 84 of the Complaint are denied. K12 has not received a copy of the November 3, 2008 Board meeting minutes, as they were not approved and distributed at the following Board meeting. To the extent that Cynwyd purports to quote from Board meeting minutes, K12 incorporates its concerns regarding the accuracy and authenticity of the Agora Board meeting minutes for the reasons described in response to paragraph 20 of the Complaint.

By way of further response, while Cynwyd now claims that K12's main priority was to grow enrollment, it was Cynwyd and the Board that decided not to cap enrollment. At the January 21, 2009 Board meeting, available online at https://sas.elluminate.com/mrlst?suid= M.701F07B97850429C0D5915C91801E2, Mr. Lebosfky stated that, following two meetings with K12, the Board was given "adequate assurances" and that the Board was satisfied that everyone was working at "120%." Accordingly, the Board determined not to cap enrollment.

85.     Admitted. By way of further response, neither Cynwyd nor the Board advised K12 of the demands made of it at the November 3, 2008 Board meeting. Upon learning of the Board's vote from Ms. Williams, who attended the November 3, 2008 Board meeting, it became clear to K12 that the Board had fundamental misunderstandings regarding public school enrollment and cyber school education. Accordingly, in his November 17, 2008 letter, Chip Hughes, K12's Executive Vice President of School Management and Services, provided Mr. Lebofsky and the Board with information regarding: (1) Agora's AYP performance; (2) improvements and initiatives underway at Agora; (3) specific responses to the Board's and Cynwyd's concerns; (4) future additional improvement initiatives; and (5) recent parent group activities. (A true and correct copy of the 11/17/2008 Ltr. is attached hereto as Exhibit 20.)

## Agora's AYP Performance

Mr. Hughes acknowledged that K12 shared Agora's desire to satisfy its AYP goals in 2008-2009. Mr. Hughes, however, cautioned Mr. Lebofsky against evaluating Agora's AYP scores in isolation, as these scores alone did not provide a complete accounting of the school's academic performance. Mr. Hughes explained that, for 2007-2008, Agora consisted of over 70% first-year Agora students, many of whom likely transferred to Agora because they were underserved in their previous schools. Mr. Hughes further explained that, for first-year students who begin in September, Agora has only five to six months to address the underperformance issues in time for the March AYP testing.

As Mr. Hughes explained:

> [w]hile K12's curriculum is very powerful, and Agora's instructional methods are based on K12's proven experience in providing individualized, one-to-one learning solutions delivered by dedicated state-certified teachers, no one can realistically expect that a student who begins his or her first school year at Agora already substantially behind is likely to succeed completely on that same year's state test.

Mr. Hughes further explained that students who have been working within the K12 curriculum for at least two years do much better than the first-year students, and that K12 fully expected the same to be true for Agora. In support of this expectation, Mr. Hughes pointed out that Agora, even with its large portion of first-year students, met 20 out of 23 possible state targets on the PSSA test in 2008.

## Specific Responses To The Board's And Cynwyd's Concerns

Mr. Hughes reiterated K12's commitment to implement specific actions requested by the Board and requested written copies of the Board-approved policies for grade placement, promotion, and retention. Mr. Hughes further advised Mr. Lebofsky that K12 has requested student academic records, as required by Pennsylvania law, as part of the enrollment process for

all new students.  Mr. Hughes explained that sending districts are often complacent in sending these records and that this is not an issue unique to Agora.  Nevertheless, Mr. Hughes advised Mr. Lebofsky that, as a result of the Board's request, K12 had completed an audit of the status of the records and had increased its efforts to obtain these records from districts that neglected to provide them to Agora in a timely manner.

### Request To Discuss Future Additional Improvement Initiatives

Mr. Hughes advised Mr. Lebofsky that K12 was interested in discussing ways for Cynwyd and Agora to work together to bring Dr. Brown's expertise in educating urban students to Agora through a variety of proposed programs.

### Recent Parent Group Activities

Finally, Mr. Hughes acknowledged the Board's concerns regarding the recent formation of a formal group for Agora parents.  Mr. Hughes explained that, at many of the virtual schools K12 serves, it provides parents with access to Elluminate, an online meeting room, for the purpose of providing the parents with a forum for communicating and sharing ideas.  After setting forth K12's view that "[p]arent satisfaction is an important measure of success of a cyber charter school, and thus it can be very valuable to provide a forum for parental involvement," Mr. Hughes advised Mr. Lebofsky that, if the Board adopted a policy removing Elluminate access for Agora parents, K12 would honor the Agora Board's decision.

86.	Admitted in part, denied in part.  It is admitted only that by letter dated November 21, 2008 (the "November 21, 2008 letter"), Board President Howard Lebofsky purported to inform Cynwyd why Cynwyd allegedly had been unable to satisfy its obligations to Agora.  The remainder of the allegations contained in paragraph 86 of the Complaint, including the substance of Mr. Lebofsky's statements, are denied.  By way of further response, the

November 21, 2008 letter did not describe a single effort by Cynwyd to improve student performance.

87.    With respect to the allegations contained in paragraph 87 of the Complaint, K12 respectfully refers the Court to the November 21, 2008 letter for the content thereof. To the extent the allegations contained in paragraph 87 of the Complaint are inconsistent with the November 21, 2008 letter, the allegations are denied. By way of further response, neither Cynwyd nor the Board advised K12 of the demands made of K12 at the November 3, 2008 Board meeting until November 21, 2008.

88.    Denied. By way of further response, after a diligent search, K12 has no record of receiving the November 18, 2008 letter described in paragraph 88 of the Complaint.

89.    Admitted in part, denied in part. It is admitted that Mr. Lebofsky sent a letter dated November 20, 2008. K12 respectfully refers the Court to the November 20, 2008, letter for the contents thereof. The remaining allegations contained in paragraph 89 of the Complaint are denied. By way of further response, Mr. Lebofsky, who is not an educator but an attorney who recently resigned from the Agora Board, summarily and with no apparent basis dismissed each and every point made in K12's letter, including its careful analysis of Agora's AYP results based on its expertise in the provision of online education, as well as its proposals regarding future additional improvement initiatives. Mr. Lebofsky also rejected K12's suggestion regarding providing parents with access to Elluminate and ordered K12 to shut down the parents' Elluminate meeting room. Finally, Mr. Lebofsky failed to provide K12 with any Board-approved grade placement, retention, and promotion policies. Instead, Mr. Lebofsky directed Mr. Hughes to contact Cynwyd for these policies. To date, and despite numerous

additional requests, Cynwyd has not provided K12 with a copy of the Board-approved grade placement, retention, and promotion policies.

90.    With respect to the allegations contained in paragraph 90 of the Complaint, K12 respectfully refers the Court to the November 26, 2008 email for the contents thereof.

91.    Denied. To the contrary, K12 has fully performed its obligations under the Cynwyd/K12 Agreement. In contrast, Cynwyd has performed little or no services in return for the $2,637,073.00 it has collected, and the $2,694,702.79 it now demands.

92.    Admitted in part, denied in part. It is admitted that Agora's enrollment and monthly revenues increased between June 2006 and February 2009. The total revenue amounts listed for November 2007 through February 2009 are also admitted. The remaining allegations contained in paragraph 92 of the Complaint are denied. K12 denies the total revenue purportedly reported on the June 2006 Quarter Report. By way of further response, despite repeated requests from K12, the PDE and Agora's former auditor, Siegel & Drossner PC, K12 has never seen or received financial information for the 2005-2006 academic year. Further, the total revenue listed for June 2006 in the Complaint conflicts with the total revenue reported to the IRS on Agora's Form 990 for 2005. (See 2005 Form 990, a true and correct copy of which is attached hereto as Exhibit 21.) Moreover, K12 provided Cynwyd with all required financial reports, as required under the terms of the Cynwyd/K12 Agreement.

93.    Admitted.

94.    Admitted that Agora's enrollment increased in the numbers stated in paragraph 94 of the Complaint. All remaining allegations in paragraph 94 of the Complaint are denied.

95.    Denied.  By way of further response, on behalf of Agora, K12 has remitted the following fees to Cynwyd since May 2006:

    a)    For the 2006-2007 school year, Agora compensated Cynwyd in the amount of $323,273.00;

    b)    For the 2007-2008 school year, Agora compensated Cynwyd in the amount of $1,892,530.11; and

    c)    For the 2008-2009 school year, Agora compensated Cynwyd in the amount of $421,269.89.

In addition, on April 20, 2009, Dr. Brown sent Mr. Corcoran an invoice for services Cynwyd rendered between October 1, 2008 and March 31, 2009, in the amount of $1,386,290.15.

On April 29, 2009, the PDE filed a Petition for Review in the Nature of a Complaint in Equity and for Declaratory Relief in the Commonwealth Court of Pennsylvania. (A true and correct copy of the Petition is attached hereto as Exhibit 22.)  In the Petition, the PDE asserted that by letter dated April 29, 2009, it informed Mr. Lebofsky that the PDE would no longer pay over funds to Agora because of the unlawful manner in which Agora was operating.  (Id. at ¶ 80.)  According to the Petition, the PDE's letter further explained that the monies that otherwise would have been paid to Agora via electronic transfer on April 30, 2009, would not be paid.  The PDE's letter also stated that PDE had established an escrow fund with the Commonwealth of Pennsylvania Office of the Budget to ensure that the children enrolled in Agora were able to receive educational services during the pendency of the matter.  (Id. at ¶¶ 81-82.)  On April 30, 2009, the PDE issued a press release announcing its decision to place Agora's funds in escrow.  (See 4/30/2009 Press Release, a true and correct copy of which is attached hereto as Exhibit 23.)

The PDE also contacted K12's General Counsel, Howard Polsky, advised him of the PDE's actions, and instructed K12 that, as the administrator of Agora's Operating Account

under the Cynwyd/K12 Agreement, it was not authorized to make any payments out of Agora's

Operating Account without the explicit approval of the Secretary of Education, notwithstanding

K12's contractual obligations. The PDE further instructed K12 that it was not authorized to

make any payments to Cynwyd in satisfaction of its management fee. Accordingly, based on the

PDE's instruction, K12 has not remitted any additional payments to Cynwyd since April 29,

2009. K12 also has not received the fees to which it is entitled under the Cynwyd/K12

Agreement as a result of the action the PDE has taken in response to Agora's and Cynwyd's

unlawful conduct.

      Immediately after the PDE placed Agora's funds in escrow and ordered K12 not

to pay Cynwyd's management fees, Cynwyd instituted the instant action alleging that K12 failed

to provide competent services to the students and parents of Agora. In fact, as recently as March

17, 2009, less than six weeks before the PDE placed Agora's money in escrow and ordered K12

not to pay its management fees, Dr. Brown praised K12's performance during a Board meeting,

broadcasted and available online via Ellumiate. Specifically, Dr. Brown advised the Board and

parents of her satisfaction with K12:

> I would just like to say what a pleasure it is has been to work with
> the people from K12. I just feel like they are working as a team
> and what they do is making such a difference in the way our staff
> views K12. It's, it's, I mean, we see how hard you're working and
> I think, really, not that you haven't been working hard all the time,
> but it's, it's just wonderful to see your commitment to education,
> and I learn something every time I'm out there, and I'm just, I just
> feel very comfortable working with you, and I've known Kevin so
> long, I mean, I just feel very close to him, but now I hope I'm not
> wrong, I feel very close to the others of you too and I think we're
> really working as a team. I think it's going to be just unbelievable
> next year.
>
> When we get started, you know, in September, with the
> supplemental work and what not, I just think the children are going
> to be the benefactors. And for me, and our parents who feel that
> the work is too hard, I would just like to remind you that it is very

difficult to get many of our children into great colleges and college begins in kindergarten and we are just trying to make sure that we meet the standards, and if you look at it like we need to meet the standards, the Pennsylvania standards, it's going to require a lot of work and we appreciate the parents, too, what they're doing to support the children for us and together.

(A true and correct recording of the 3/17/09 Board meeting is available at https://sas.elluminate.com/mrlst?suid=M.701F07B97850429C0D5915C91801E2.

These sentiments were echoed by Mr. Lebofsky in an email dated March 20, 2009 to Ron Packard, K12's Founder and CEO, regarding Mr. Reed's performance:

I just wanted to take a moment to let you know how pleased I am with Darren Reed's leadership as Acting Head of School. In addition to his exemplary personal qualities and standards, Darren is a tremendous school executive. Immediately upon arrival, Darren exercised the necessary command and control to help turn the school around. Darren is on top of everything, is always responsive, and his candor, observations, opinions and insight are valued highly.

Thank you very much for sharing Darren with us. He is definitely the right man for the job. I know that you appreciate him as much as we do on the Agora Board.

(A true and correct copy of the 3/20/2009 email is attached hereto as Exhibit 24.)

96.     With respect to the allegations contained in paragraph 96 of the Complaint, K12 respectfully refers the Court to the July 31, 2008 email for the contents thereof. To the extent the allegations set forth in paragraph 96 of the Complaint are inconsistent with the July 31, 2008 email, the allegations are denied.

97.     With respect to the allegations contained in paragraph 96 of the Complaint, K12 respectfully refers the Court to the July 31, 2008 email for the contents thereof. To the extent the allegations set forth in paragraph 97 of the Complaint are inconsistent with the July 31, 2008 email, the allegations are denied.

98.     With respect to the allegations contained in paragraph 98 of the Complaint, K12 respectfully refers the Court to the August 1, 2008 invoice for the contents thereof. To the extent the allegations set forth in paragraph 98 of the Complaint are inconsistent with the August 1, 2008 invoice, the allegations are denied.

99.     With respect to the allegations contained in paragraph 99 of the Complaint, K12 respectfully refers the Court to the April 20, 2009 fax for the contents thereof. To the extent the allegations set forth in paragraph 99 of the Complaint are inconsistent with the April 20, 2009 fax, the allegations are denied.

100.    Denied. By way of further response, no amount is owed to Cynwyd until the PDE concludes its proceedings against Agora and determines what, if any, services Cynwyd provided to justify its fee.

101.    Admitted. K12 has at all times followed the PDE's instructions and, based on the PDE's instruction that K12 is not authorized to make any payment to Cynwyd in connection with Cynwyd's management fees, K12 has not remitted any payments to Cynwyd since April 29, 2009.

## BREACH OF CONTRACT

102.    K12 restates and incorporates by reference its responses to paragraphs 1 through 101 above as if set forth in full herein.

103.    Admitted.

104.    Denied.

105.    Denied.

106.    The allegations contained in paragraph 106 of the Complaint are denied as conclusions of law to which no response is required. To the extent that Cynwyd purports to

quote from the Cynwyd/K12 Agreement, K12 respectfully refers the Court to the Cynwyd/K12 Agreement for the contents thereof. To the extent the allegations set forth in paragraph 106 of the Complaint are inconsistent with the Cynwyd/K12 Agreement, the allegations are denied.

107. Admitted in part, denied in part. It is admitted that Cynwyd has failed to utilize dispute resolution mechanisms set forth in the Cynwyd/K12 Agreement. The remaining allegations set forth in paragraph 107 of the Complaint are denied.

108. Denied.

## AFFIRMATIVE DEFENSES

109. Plaintiff fails to state a claim upon which relief can be granted.

110. Plaintiff's claims are barred, in whole or in part, because any loss sustained by plaintiff was due to its own acts or omissions over which K12 had no control.

111. Plaintiff's claims are barred, in whole or in part, by the defense of frustration of purpose.

112. Plaintiff's claims are barred, in whole or in part, by the defense of unclean hands.

113. Plaintiff's claims are barred based, in whole or in part, on the doctrines of fraud and equitable estoppel.

## K12's COUNTERCLAIMS AND THIRD PARTY COMPLAINT

## INTRODUCTION

114.    As shown above, and set forth in additional detail below, the Agora Board has failed to meet its fiduciary and statutory obligations to the students and parents of the Agora community.  Instead, they have acted at the behest and for the benefit of Dr. Brown, with whom many current and former Board members have or have had financial and personal relationships. The conflicted loyalty of these current or former Board members can be demonstrated in any number of ways, but two facts are particularly illustrative.

First, in the suit it filed against the PDE, Agora requests the Court to prohibit the PDE from pursuing the revocation of the Agora charter because, among other reasons, the PDE's revocation of the charter would harm Agora's students.  The Agora Board also seeks money damages from the PDE in the amount it claims it owes Cynwyd.  On June 11, 2009, the PDE offered to withdraw the revocation proceedings if the Agora Board were replaced with members who have no financial relationship with Dr. Brown and if Agora terminated its relationship with Cynwyd.  The Agora Board did not accept this offer, and instead again reiterated its demand that Cynwyd be paid.

Second, either by making demonstrably false statements in Board meetings or by allowing Dr. Brown to wrongly attribute statements to them, the Board and its members have joined Cynwyd and Dr. Brown in making good on her threat that K12 would "go down for this." The conduct of the Agora Board and its past, present, and *Ex Officio* members has damaged K12 by causing the PDE to suspend the payment of all management fees, including those owed to K12, and by requiring K12 to defend itself in two separate litigations.  More importantly, their conduct has jeopardized the ability of more than 4,400 students to receive the education to which

they are entitled, and has deprived Agora's dedicated teachers and families of the certainty that Agora will continue to exist.

Cynwyd and Dr. Brown's conduct also has damaged K12, both in terms of the money it is owed for the exceptional services it has provided and its national reputation as the preeminent provider of cyber education. At every turn, Dr. Brown has served her own interests and repeatedly has used intimidation and threats against those who oppose her for the sake of Agora's students. In response to parents' perceived disloyalty and criticism, she sued them for defamation and has demanded thousands of dollars. In response to K12's refusal to "get on the same page," she orchestrated four lawsuits and a vigorous defense to revocation proceedings that could have been resolved were it not for her insistence that she is entitled to an additional $2 million for services she plainly did not provide. While protected by the Agora Board, Dr. Brown has not been held accountable. K12 now brings these claims against her individually and the company she alone owns to hold her responsible for her misconduct and recover the damages she has caused.

## PARTIES

115.    As stated above, K12 is the nation's leading provider of proprietary curriculum and online school programs for students in grades kindergarten through 12.

116.    As stated above, Cynwyd is a management company formed by Dr. June Brown and Brien Gardiner. Upon information and belief, Dr. Brown is a Pennsylvania resident and is Cynwyd's sole owner and employee. For the reasons set forth below, Dr. Brown also is Cynwyd's alter ego, and accordingly is sued individually.

117.    Agora Cyber Charter School ("Agora") is a Pennsylvania non-profit corporation that K12 has served since 2006.

## JURISDICTION AND VENUE

118.    Jurisdiction is appropriate in this Court based upon diversity and/or supplemental jurisdiction, pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

119.    Venue is appropriate in this Court because a substantial part of the events or omissions giving rise to K12's claims occurred in the Eastern District of Pennsylvania.  28 U.S.C. § 1391(b).

## BACKGROUND AND FACTS

120.    The allegations set forth in response to Cynwyd's Complaint are hereby incorporated as if set forth fully herein.

121.    K12 is the nation's leading provider of proprietary curriculum and online school programs for students in grades kindergarten through 12.  K12 provides its curriculum and academic services to online schools, traditional classrooms, blended school programs, and directly to families.  K12 Inc. also operates the K12 International Academy, an accredited, diploma-granting online private school serving students worldwide.

122.    K12 has eight (8) years of significant experience operating virtual public schools with end-to-end school management solutions (e.g., curriculum, technology, logistics, and administration).  K12 currently provides these services to approximately 56,000 virtual public school students in 21 states and the District of Columbia.  K12 has provided end-to-end school services to Agora Cyber Charter School ("Agora") since the 2006-2007 school year.  In addition to providing Agora's students with its first-rate curriculum and the technology (including computers) Agora's students require, K12 provides extensive administrative and management services including, but not limited to, the following areas:

## Human Resources Services

- Human resources functions, including recruitment and training of faculty

- Conduct interviewing (including second- and third-rounds, if necessary)

- Check references, certification, and background checks of finalists

- Prepare employment agreements for teachers on behalf of the Governing Authority

- Manage employee benefits for the Charter School

## Financial Services

- Set up third-party accounting, reporting and planning software

- Establish the Charter School's chart of accounts

- Prepare periodic budget assessments

- Prepare periodic reports comparing actual results to budget

- Prepare annual budget for adoption by the Governing Authority

- Perform accounting services for the Charter School

- Assist with the administration of federal entitlement programs (e.g., Title I, I.D.E.A.)

- Assist in identifying and developing fundraising and revenue enhancements on behalf of the Charter School

- Administer school payroll

## Admissions, Enrollment, Pupil Recruitment, and School Administration

- Hire Head of School and other essential personnel

- Propose policies and procedures for the Charter School

- Plan and arrange school orientation sessions

- Arrange contracts with school districts, education service centers, and professional service providers for special education and other support services on the Charter School's behalf

- Manage day-to-day operations with families, students, teachers, Governing Authority, press, vendors, contractors, school districts, educations service centers, and others

- Oversee compliance with Charter School's policies and procedures, subject to Cynwyd oversight

- Prepare the Charter School to meet reporting and audit requirements

- Prepare the Charter School for the accreditation process

- Create, design, and publish the Charter School's applications and enrollment packages and make them available on the Charter School-specific web site for downloading

- Answer enrollment questions from potential families (phone, mail, and e-mail) and assist Cynwyd in managing, manage the enrollment process, including the processing of paperwork and data entry

- Apprise families of their status in the Charter School's enrollment process

### Family Services

- Field and respond to incoming calls, letters, faxes, and e-mails about the Charter School, its curriculum, the application/enrollment process, instructional materials, etc.

- Conduct focus groups, surveys, interviews, observation sessions, and/or user testing on the online school program to obtain feedback on how to improve the program

- Create "feedback buttons" on lessons so that students, parents, and teachers may send in lesson comments and suggestions; respond to suggestions and implement improvements

- Assist the Charter School with setting up school outings and events throughout the year

### Teacher Training and Professional Development

- Advise and assist with the creation of teacher training materials for new and returning teachers

- Create and mail new student packages, including the "K12 Start-Up Guide" to newly enrolled families

- Assist with the design and implementation of parent orientation sessions

- Collect, analyze, and disseminate research on teacher quality in a virtual environment

**<u>Technology Services</u>**

- Provide laptops

- Support teachers and customer care associates in answering technology-related questions from students, parents, teachers, and administrators

- Research, study, and select a web-filtering device to restrict student access to inappropriate materials on the Internet

- Conduct teacher and administrator training in all the Charter School's technology systems

123.    In addition to providing the Agora community with curriculum, computers and other technology, and administrative services, K12 also serves the Agora community with a team of fifteen (15) administrators and education professionals located in Devon, Pennsylvania. Agora is supported by a central team of administrators, education professionals, and experts, most of whom are stationed at K12's headquarters in Herndon, Virginia, and who provide support services to Agora's students, teachers, and families in the areas of curriculum, technology, logistics, and professional development.  In contrast, and with the exception of a brief period of time when Cynwyd retained a consultant, Cynwyd's sole employee is its owner, Dr. Brown.

124.    K12 serves 56,000 students nationally.  Over the past 10 years, K12 has consistently found that the longer a student has participated in the K12 program, the more likely the student is to be proficient in all measures of AYP.  Specifically, more than 90% of students who have been with K12 for 6 years are proficient in reading, and more than 90% of students who have been with K12 for 7 years are proficient in math.  These trends are also true at Agora, where the performance of returning students for the 2007-2008 academic year in the reading PSSA was 22 percentage points higher than that of the first-year students, and the equivalent increase on the math PSSA was 12 percentage points.

Significantly more K12 students who have been in a K12 program since kindergarten scored "proficient or better" on state tests than overall state averages across 6 states. For instance, 4th graders who have been with K12 since kindergarten scored 18 percentage points higher in math and 20 percentage points higher in reading in these states. K12's consistent performance leads to high parent satisfaction. 94% of parents of kindergarten through eighth grade students state that they were satisfied or highly satisfied with the K12 curriculum, and 92% of teachers express satisfaction with the K12 curriculum. 79% of parents state that their student receives a more advanced education with K12 compared to their prior public school. Indeed, Ohio Virtual Academy and Pennsylvania Virtual Charter School were named the Parent's Choice winners as best high schools in Ohio and Pennsylvania, respectively, by *Business Week* magazine and GreatSchools.net.

The proof of the success of the K12 curriculum can also be measured by college admissions. Among other four-year colleges, the graduates of K12 schools in the Class of 2009 were accepted to the following colleges and universities: University of California at Berkeley, Cornell University, Carnegie Mellon University, Brigham Young University, Baylor University, Michigan State University, Middlebury College, Ohio State University, Penn State, Purdue University, Temple University, Tulane University, University of Michigan, University of Texas, and University of Washington.

125.    K12's reputation as the premier provider of cyber charter school curriculum and services was central to Dr. Brown's and Agora's decision to subcontract the vast majority of Cynwyd's obligations to K12. As Dr. Brown stated at the time the Cynwyd/K12 Agreement was announced, K12 is a company with a "proven track record as a leading provider of top-quality curriculum, academic services, and teacher training." (A true and correct copy of

Dr. Brown's comments are attached hereto as Exhibit 25.) Dr. Brown announced her and the Board's confidence in K12's ability to provide Agora's students with "the best education and support structure a public cyber school can offer." Specifically, Dr. Brown stated: "The Board of Directors is extremely excited to offer this new public school option to families across Pennsylvania. We believe it is a mark of excellence for Agora Cyber Charter School to be a K12 certified school. It gives us every assurance that Agora will operate with the highest standards of quality and support to fully meet the needs of students throughout the Commonwealth."

126.    From May 2006 to February 2008, shortly before Mr. Gardiner resigned from Cynwyd, the relationship between K12 and Cynwyd was, based on Mr. Gardiner's statements, constructive and no complaints were raised concerning K12's performance. At the same time, Cynwyd was not forthcoming about the operations, policies, and procedures of Agora's Board, and it began to become apparent that Cynwyd was attempting to serve its interests and not the Agora community's. Further, Cynwyd made repeated efforts to keep K12 from interacting directly with the Agora Board.

127.    More specifically, between May 2006 and December 2007, Agora's office was located inside a classroom at the Philadelphia Academy Charter High School ("PACS"), a charter school founded by Mr. Gardiner. During this time period, Sharon Williams and Kevin Corcoran had about four meetings at PACS with Dr. Brown and Mr. Gardiner regarding Agora. During these meetings, which lasted no more than one hour each, K12 provided Dr. Brown and Mr. Gardiner with PowerPoint presentations regarding Agora's enrollment, curriculum, and finances. Ms. Williams also provided Dr. Brown and Mr. Gardiner with copies of the presentation materials. Dr. Brown and Mr. Gardiner neither requested additional documentation nor were critical of K12's presentations or the information provided.

128.    In addition, Dr. Brown and Mr. Gardiner did not provide K12 with any information or updates regarding Cynwyd's activities with respect to Agora. In fact, Dr. Brown's and Mr. Gardiner's only questions to K12 related to Agora's enrollment numbers and how much revenue those numbers would generate for Cynwyd under its Management Agreement. With the exception of these near-quarterly meetings, K12 did not see or hear from Dr. Brown between May 2006 and late-May 2008.

129.    While located at PACS, K12 frequently saw and spoke with Mr. Gardiner and he never advised K12 of any complaints or issues with respect to its performance, in any respect. To the contrary, Mr. Gardiner often commended K12's performance and made comments like "that's why we hired you to run the school." In response to K12's inquiries regarding Board meetings, Mr. Gardiner consistently responded that he did not know anything about the Board.

130.    During its near-quarterly meetings with Dr. Brown and Mr. Gardiner, K12 requested from Cynwyd copies of Agora's Board-approved policies, meeting schedules, and meeting minutes. In response to K12's requests to attend Board meetings, Dr. Brown told K12 that the Board was "reorganizing" and "learning about its role" and that the Board meetings were "nothing [K12] needed to attend." On several occasions, Dr. Brown asked K12 "why do you want to attend a meeting anyway?"

As a consequence of Cynwyd's efforts to prevent K12 from interacting with the Agora Board, K12 was unable to observe whether Cynwyd was performing obligations that Cynwyd represented it would undertake, including the design and management of pre-school and special education programs and the development of programs for at-risk youth.

131.     On November 16, 2007, Mr. Hughes, Ms. Stagner, Ms. Williams, and Mr. Corcoran met with Dr. Brown and Mr. Gardiner at PACS.  The purpose of the meeting, which K12 initiated, was to discuss successes in K12's first year running Agora, enrollment and retention of students, facilities, finances, the Board, academics, and regular meetings and communication.  (A true and correct copy of the 11/14/2007 email and agenda are attached hereto as Exhibit 26.)  Ms. Williams provided Dr. Brown and Mr. Gardiner with a packet containing the same information.  Dr. Brown and Mr. Gardiner did not raise any concerns or issues regarding K12's performance during the meeting.

132.     During the meeting, Dr. Brown advised K12 of the upcoming Pennsylvania System of Cyber Charter Review ("PASCCR") to be conducted by the PDE and provided K12 with copies of a PowerPoint document that she was advised to follow by Greg Spadafore of the PDE.  (A true and correct copy of the PASCCR PowerPoint is attached hereto as Exhibit 27.)  Ms. Williams informed Dr. Brown that she had spoken to Mr. Spadafore regarding the PASCCR meeting, and Dr. Brown instructed Ms. Williams that she was not to speak with anyone from the PDE because she (Dr. Brown) "has a reputation to maintain."

133.     As part of the meeting, Dr. Brown and Mr. Gardiner advised K12 that Cynwyd had purchased a property for Agora located at 60 Chestnut Avenue, Devon, Pennsylvania, and took K12 to view the property.  During the car ride to Devon, Ms. Williams inquired with Dr. Brown regarding upcoming Board meetings.  Dr. Brown advised K12, for the first time, that Board meetings were held on the third Tuesday of the month, every other month, on even numbered months only, and not in the summer.  Ms. Williams advised Dr. Brown that she planned to attend the December 2007 meeting, and Dr. Brown did not object.

134.    On December 16, 2007, Ms. Williams met with Dr. Brown and Mr. Gardiner in a conference room located at PACS to discuss the Board packets that Ms. Williams provided at the November 16, 2007 meeting.  During the visit, Ms. Williams advised Dr. Brown that she planned to attend the Board meeting scheduled for that evening.  Dr. Brown advised Ms. Williams that it was not necessary for her to attend the meeting.  According to Dr. Brown, the Board was still learning about the school and she did not want Board members to be intimidated by K12's presence.  Based on Dr. Brown's directive, Ms. Williams did not attend the December 16, 2007 meeting.

### Cynwyd's Breaches Of Its Obligations To Agora

135.    Cynwyd claims in its Complaint that K12 has breached the Cynwyd/K12 Agreement.  Just the opposite is true.  Time and again Cynwyd has elevated its interests over the students and families of the Agora community, with the consequence that Cynwyd, acting in concert with the Agora Board, has triggered the PDE's revocation proceedings.

136.    For example, the PDE is now investigating how a $205,500 check, sent to Agora in connection with a Federal Implementation Grant, failed to be deposited into the Agora Operating Account and instead was deposited into a secret account established by the Agora Board, Cynwyd, and Dr. Brown.

137.    By way of background, in August 2006, at Cynwyd's direction, K12 opened an Operating Account at Wachovia Bank in Wayne, Pennsylvania for Agora, over which three representatives of K12 had signatory authority.  In August 2008, K12 learned that Agora maintained an additional operating account, which K12 did not have access to, at the same bank. Dr. Brown advised K12 that the additional account, which K12 did not have access to, was from Agora's operation during the Pilot Program.

138. In or around March 2009, the PDE conducted a comprehensive audit of Agora's financial, administrative, operational, and governance records. During the PDE's audit, K12 learned that Agora had received the Federal Implementation Grant check, in the amount of $205,500, on April 6, 2007. (A true and correct copy of the Federal Implementation Grant check is attached hereto as Exhibit 28.) K12 was unaware of Agora's receipt of the Federal Implementation Grant funds until the PDE's audit in March 2009.

## Cynwyd Has Charged Agora More Than Double Market Value Rent

139. Cynwyd violated its obligations to Agora, thus precipitating the PDE's revocation proceedings, in a number of other ways. For example, on or about November 19, 2007, Cynwyd Group purchased the property located at 60 Chestnut Avenue, Devon, Pennsylvania, 19333-1300 (the "Devon Site") for $1,950,000.00. (A true and correct copy of the Property Detail Report is attached hereto as Exhibit 29.) On December 1, 2007, Cynwyd, represented by counsel, executed a lease agreement with the Agora Board, unrepresented by counsel, to lease the Devon Site. (A true and correct copy of the lease agreement is attached hereto as Exhibit 30.) The lease agreement authorizes the rental of 12,000 square feet for $25,000 per month, while Agora only occupies the second floor of the two-story building, which yields approximately 9,000 square feet attributable to Agora's use. The lease requires Agora to assume all or substantially all operating costs of the entire building and property at the Devon Site, including various maintenance fees and certain capital improvements such as plumbing and electrical work.

140. On June 2, 2009 the PDE provided to K12 a copy of "Lease Evaluation for 60 Chestnut Avenue, Devon, PA," ("Evaluation") prepared by CB Richard Ellis for PDE. The Evaluation of the Devon Site concluded "[o]verall, it is our opinion that the lease document

was poorly negotiated in the favor of the Lessee and that the Lessee was probably not represented with appropriate real estate counsel." The Evaluation further concluded that Agora's lease payment was nearly double the fair market value. (A true and correct copy of the 6/2/2009 Evaluation is attached here to as Exhibit 31.)

### Dr. Brown Did Not Conduct Weekly Meetings with K12's Staff And Rarely Attended To Her Responsibilities At Agora

141. In the Complaint, Cynwyd portrays Dr. Brown as having provided valuable services to K12, thereby attempting to justify the additional $2,694,702.79 in fees it demands. The record conclusively demonstrates that Cynwyd and Dr. Brown failed to provide even basic services to Agora.

142. For instance, and contrary to its allegations in the Complaint, Cynwyd never conducted weekly meetings with the K12 staff. Between May 2006 and May 2008, Dr. Brown and Mr. Gardiner held no more than six meetings with Ms. Williams and Mr. Corcoran, wherein Dr. Brown and Mr. Gardiner provided no information regarding Cynwyd's activities with respect to Agora.

143. In or around April 2008, the *Philadelphia Inquirer* began reporting on alleged conflicts of interest and misappropriation involving Mr. Gardiner and the Philadelphia Academy Charter School, and on May 14, 2008, PACS terminated Mr. Gardiner's consulting agreement based on conflicts of interest and other misconduct. In a similar vein, on May 22 2008, the *Philadelphia Inquirer* reported that Pennsylvania Public School Employees' Retirement System ("PPSERS") was investigating Dr. Brown based on state records reflecting that she simultaneously held two full-time jobs that together paid her more than $331,000 a year. (A true and correct copy of the 5/22/08 article is attached here to as Exhibit 32.) In response, in

July 2008, the Pennsylvania Legislature amended the Charter School Law to prohibit charter school administrators from collecting multiple salaries.

144.    As a result of the *Philadelphia Inquirer* articles, together with K12's ongoing difficulties with Dr. Brown and the Board regarding their lack of transparency and responsiveness, Mr. Hughes wrote to then-Board President James Marshall and requested a meeting between K12's management teams and the members of the Board to occur as soon as possible.  In his letter, Mr. Hughes explained K12's concerns:

> Over the recent months, the K12 management team has become increasingly concerned about a number of issues, including governance and oversight, which could impact the Agora Cyber Charter School and the more than 3,000 students who are currently enrolled.  K12 believes it is appropriate to address these issues directly with the Agora Board on behalf of the teachers, parents, and children we serve.
>
> Unfortunately, over the past two years K12 has been largely prevented from developing a relationship with the Agora Board and from directly communicating with its members, even though K12 delivers the day-to-day academic and operational services for the school and is most closely connected to the teachers and families.  More recently, our concerns have been amplified by reports in *The Philadelphia Inquirer* detailing certain alleged irregularities of Dr. June Brown, her financial arrangements with other schools, and an investigation by the Pennsylvania Public School Employees' Retirement System, all of which were a revelation to K12 management.
>
> As you know, Dr. Brown serves as the Chief Administrative Officer of the Agora Cyber Charter School and as a managing director of The Cynwyd Group LLC, which is responsible for oversight and other services under a contract agreement with the Agora Board.  K12 provides our complete academic programs and management services to the Agora school under a sub-contract agreement with Cynwyd.  Based on these relationships and recent news reports about Dr. Brown, Agora families have also raised questions and expressed serious concerns, and we feel obligated to gather all the facts to provide answers.

(A true and correct copy of the 5/30/2008 Ltr. is attached hereto as Exhibit 33.)

145. Immediately after the publication of the *Philadelphia Inquirer* articles and Mr. Gardiner's resignation from Cynwyd, K12 noticed a short-lived increase in Dr. Brown's communications with K12 and visits to Agora. Specifically, between May 2008 and August 2008, Dr. Brown called K12 and visited Agora several times, primarily to discuss payments to Cynwyd under the Management Agreement and to enlist K12's assistance in responding to a "request from the state." As K12 later learned, the "request from the state" was, in fact, a federal grand jury subpoena issued to Agora for documents.

**The Parents Become Concerned, And Dr. Brown Attempts To Prevent The Agora Parents From Organizing**

146. Around this time, K12 also began receiving phone calls and emails from Agora parents regarding the *Philadelphia Inquirer* articles and requesting from K12 information about the Board's policies, meeting schedule, meeting minutes, and members. K12 advised parents of the Board's meeting schedule, but was unable to answer questions regarding the Board's policies, composition (which changed frequently), and meeting minutes, as K12 had repeatedly requested but had not received this information.

147. On November 10, 2008, a number of parents formed the Agora Parent Organization ("APO") "to support Agora in a variety of ways in building and maintaining a sense of community among parents, staff, administration, and students." (A true and correct copy of the APO's 11/18/2008 Ltr. to Mr. Lebofsky is attached hereto as Exhibit 34.) As evidenced by the APO's November 18, 2008 letter to Mr. Lebofsky, the APO made numerous efforts to obtain from the Board answers to some basic questions including, but not limited to, "When is the next board meeting?," "Who is Agora's chief executive officer?," "Who is Agora's chief academic officer?," and "Who is Kathleen Suloff?"

148.     As a result of the increasing pressure being exerted by the parents, Dr. Brown threatened Ms. Williams by telling her that she would be fired if she did not "get rid of the parents." As a result of Ms. Williams' refusal to "shut down the parents," Mr. Lebofsky, by letter dated November 20, 2008, advised K12 of its dissatisfaction with Ms. Williams' performance. (A true and correct copy of the 11/21/2008 Ltr. is attached hereto as Exhibit 35.) Following Mr. Lebofsky's letter, Ms. Williams resigned as Agora's Head of School and Darren Reed assumed the Head of School position on an interim basis.

149.     Ms. Williams' resignation enraged the parents, many of whom viewed Ms. Williams and Agora synonymously due to Ms. Williams' tireless dedication to Agora's students, parents, and mission, and the lack of any contact with anyone from the Agora Board. Many Agora parents voiced their sadness and frustration over Ms. Williams' resignation on Agora's Parents' Yahoo! chat board and attributed her departure to Dr. Brown and the Board.

150.     On December 3, 2008, Gladys Stefany, an Agora parent, wrote to Gregg Spadafore of the PDE about the management structure of Agora, and provided Mr. Spadafore with a list of concerns and copies of her correspondences with the Board. According to Ms. Stefany:

> In brief, my concerns are that the BOT [Board of Trustees] has consistently failed to comply with the terms of its Charter in all the areas mentioned in the letter you received from the Agora Parent Organization. In addition, they have been operating in violation of the Sunshine Law and the Right to Know Law. There is also the appearance of incredible financial mismanagement. Here is how it appears to me:
>
> - June Brown and Brien Gardiner (now under indictment for fraud) found the Agora Cyber Charter School.
>
> - In her role as founder, June Brown is responsible for assembling the first Board of Trustees
>
> - June Brown and Brien Gardiner found Cynwyd Group

- The BOT organized by June Brown contracts with Cynwyd Group for management services to the tune of 7% of the gross revenues of the Agora Cyber Charter School

- The BOT organized by June Brown signs a lease with her company, Cynwyd Group, for office space for the Agora Cyber Charter school for $25,000 per month

- The same June Brown has been, according to the Philadelphia Inquirer, under investigation for collecting full time salaries from multiple Philadelphia charter schools

- The legislature passed a law prohibiting the above actions and Dr. Brown, who was called the CEO of Agora, is now called the "Open Records Officer" and, most recently, senior consultant. Despite asking repeatedly over the past six months, we have been unable to get an official title for her or her role in the organization yet she clearly is "in charge".

- While searching documents for Agora and the other charters with which Dr. Brown is heavily involved, the names of the same BOT members pop up over and over again. These are "hardly" independent Boards.

- Dr. Brown has taken it upon herself to make phone calls to parents calling for their children to be retained based in large part upon PSSA scores regardless of the progress the child has been making in the curriculum. (Bear in mind that most of our students are very new to the school and need some time to catch up before their PSSA scores will reflect their actual progress).

- In November, the Agora Parent Organization was formed. Our mission is that of a PTA or PTO but, we chose to be independent because we didn't want to pay dues to a national organization. Our goal is to support the mission of our school. We organized with the full knowledge and support of our head of school and our first meeting was announced in the school newsletter and through the school's KMail system which has email access to every family enrolled in Agora. Because we are a cyber and our families are all over the Commonwealth, our head of school made the online classroom (Elluminate) available to us for our meeting.

- At our first meeting, in addition to passing our bylaws and electing officers, concerns were raised about the Board of Trustees and the group voted to write a letter asking the BOT to answer some questions for us. We never received the answers to our questions, but the BOT shut down the APO's access to Kmail and the online classroom in an effort to prevent us from communicating with each other, holding meetings, etc.

- We managed to pull together a second meeting using a free trial subscription to Webinar which will run out on December 26th. At the 2nd meeting, in response to the BOT's actions to prevent us from meeting and communicating with each other, a motion was passed to contact your office.

- Last Thursday, (with little more than 24 hours notice) the BOT held an "information session" via Elluminate. At that time they announced the formation of the "OFFICIAL" Agora Parent Organization for which they are choosing the members "via lottery".

(A true and correct copy of the 12/3/2008 Ltr. is attached hereto as Exhibit 36.)

151.    By letter dated December 29, 2008, the PDE, in turn, wrote to Kathleen Suloff, Agora's purported CEO, and requested a response to Ms. Stefany's letter. (A true and correct copy of the 12/29/2008 Ltr. is attached hereto as Exhibit 34.) In his January 8, 2009 response to the PDE, Mr. Lebofsky summarily dismissed Ms. Stefany's and the APO's concerns, characterizing them as "mean spirited, occasionally racist, quite probably slanderous and otherwise improper," and reaffirmed the Board's support of Dr. Brown. (A true and correct copy of the 1/8/2009 Ltr. is attached hereto as Exhibit 37.)

152.    On January 21, 2009, Dr. Brown and Cynwyd responded to this criticism by suing the APO and six Agora parents, including Ms. Stefany, for defamation. Dr. Brown and Cynwyd have demanded more than $50,000, plus attorneys' fees, interest and costs, as damages from the parents. (A true and correct copy of the defamation lawsuit is attached hereto as Exhibit 38.)

### Dr. Brown's Attempts To Circumvent the Charter School Law

153.    On July 12, 2008, the *Philadelphia Inquirer* reported that Governor Rendell's administration had drafted an amendment to the Charter School Law prohibiting charter school administrators from collecting multiple salaries. (See 7/12/2008 article, a true and correct copy of which is attached hereto as Exhibit 39.)

154.     Moreover, on or about July 22, 2008, Dr. Brown called Mr. Corcoran and requested that he add "on behalf of Kathleen Suloff" after Dr. Brown's signature on the Preliminary Statement of Revenues, Expenditures and Fund Balances that Agora was required to submit to the PDE as part of the 2008 Charter Annual Report, which Dr. Brown had signed on the previous day.  Dr. Brown advised Mr. Corcoran that she had been wrongly signing Agora forms to the PDE as the CEO when, in fact, "Kathleen has been the CEO for some time," and "Kathleen has given me authority to sign on her behalf......but I need to start putting 'on behalf of' following my signature."

155.     Because neither he nor Ms. Williams had ever heard Ms. Suloff's name during their two years at Agora, and all official correspondence from the PDE on which K12 had been copied indicated Dr. Brown as the CEO and never mentioned Ms. Suloff, Mr. Corcoran asked Dr. Brown when the "change" went into effect.  Dr. Brown stated that Ms. Suloff had been the CEO on file with the Commonwealth "for a long time now, probably just after we were granted the charter."  Dr. Brown stated that, after she "stepped down from the Founding Committee, the Board elected Ms. Suloff to serve in a non-pay capacity as CEO."  Dr. Brown further explained that Ms. Suloff had permitted Dr. Brown to sign on her behalf for the past two years.  Mr. Corcoran then asked why all "formal" correspondences from the Commonwealth listed Dr. Brown as CEO with no mention of Ms. Suloff, and Dr. Brown stated that "you know how Harrisburg works -- they probably are not communicating internally."

156.     Mr. Corcoran told Dr. Brown that he did not recall Ms. Suloff's name and asked if he had ever met her.  Dr. Brown stated that "I'm sure you have......you probably just don't remember her.  She is here (at Dr. Brown's office located at 124 Bryn Mawr Avenue)

everyday." Dr. Brown then asked Mr. Corcoran to help her "make sure" that she signed all future reports with the phrase "on behalf of Kathleen Suloff" after her own signature.

157.    Similarly, shortly following the Pennsylvania Legislature's amendments of the Charter School Law and on or about October 16, 2008, Cynwyd's counsel, Albert S. Dandridge, III, called Howard Polsky, K12's General Counsel, to request an amendment to the Cynwyd/K12 Agreement in light of the change to the Charter School Law.

158.    By email dated October 16, 2008, Mr. Dandridge provided Mr. Polsky with a draft of the proposed amendment (in final and redlined form), and the relevant portions of the House Bill 1067, which amended the Charter School Law to prohibit an administrator of a charter school from receiving compensation from another charter school or a company that provides management or other services to another charter school.  (A true and correct copy of the 10/16/2008 email and accompanying documents are collectively attached hereto as Exhibit 40.) As set forth in the proposed amendment, Cynwyd proposed replacing the term "management services" with "educational, operational, financial and administrative services."

159.    During a conference call on October 23, 2008, Mr. Polsky and John Baione, Senior Vice President, Finance, discussed the proposed amendment with Mr. Dandridge. Mr. Polsky stated that K12 provides Agora with comprehensive educational, operational, financial and administrative services, and asked Mr. Dandridge what services Cynwyd would provide beyond the services currently provided by K12 in light of the proposed amendment.  Mr. Dandridge did not have an answer to this question other than vague references to oversight, so K12 declined to amend the Cynwyd/K12 Agreement as described above.

160.    At Dr. Brown's insistence, her counsel and K12 continued to discuss whether the Cynwyd/K12 Agreement properly could be amended and, if so, what additional

services Cynwyd would provide.  After several additional weeks of discussion, Cynwyd dropped its attempts to amend the agreement.

### The PDE Visits Agora, And Dr. Brown Insists On "A United Front" And Threatens K12

161.    On February 24, 2009, Teresa Bradley of the PDE advised Dr. Brown and Mr. Lebofsky that Dr. Parker Martin and Greg Spadaore of the PDE and two Labor, Education and Community Services Comptroller's Office ("LECS") auditors would visit Agora on March 2, 2009.  (A true and correct copy of the 2/24/2009 email is attached hereto as Exhibit 41.)  In preparation for the audit, the PDE requested Agora's financial records, management agreements, leases, contracts, student records, employee files, board minutes, and other governance related documents.

162.    The PDE's inquiries to Agora resulted in another brief increase in phone calls and visits from Dr. Brown.  Between late February 2009 and May 2009, Dr. Brown visited Agora several times and called Mr. Reed about 2 to 5 times per week, mainly to discuss Agora's response to the PDE's letter and strategy for the PDE's visit.  During these visits and phone calls, Dr. Brown stressed to K12 the importance of "presenting a united front" to the PDE.

163.    For instance, in or around late February 2009, following the PDE's February 24, 2009 notice to Agora regarding its visit scheduled for March 2, 2009 (see Ex. 41), Dr. Brown emphasized with Mr. Reed the importance of Cynwyd and K12 being on the "same page" with respect to the PDE.  Dr. Brown encouraged Mr. Reed to be candid with her, and told him that "I am not the kind of person to rat you out, but if you do it to me . . ."  Dr. Brown did not complete the sentence, but Mr. Reed clearly understood this statement to be a thinly veiled threat that, if she perceived that K12 was disloyal to her, she would reciprocate accordingly.

164. During the three-and-a-half work days between the PDE's February 24, 2009 email and the March 2, 2009 scheduled visit, Dr. Brown visited the Agora office for the purpose of preparing for the PDE audit. Specifically, Dr. Brown told Mr. Reed and Mr. Corcoran that she wanted to insure that K12 and Cynwyd were "on the same page" and suggested meeting on Friday, February 27, 2009, for the purpose of performing a "walk through" of the meeting with the PDE. K12 did not participate in the "walk through" meeting.

165. As a result of a snowstorm, the March 2, 2009 PDE visit was cancelled and rescheduled for mid-March. In the interim, Dr. Brown visited Agora and telephoned Mr. Reed several times for the purpose of making sure that K12 and Cynwyd were "on the same page" with respect to various issues raised by Ms. Stefany in her December 22, 2008 letter to the PDE.

166. For instance, in an apparent attempt to respond to Ms. Stefany's complaint to the PDE regarding the Board's lack of responsiveness, on or about March 3, 2009, Dr. Brown instructed Mr. Reed to assemble a contacts lists for Agora with times parents could call to address certain issues. Mr. Reed told Dr. Brown that K12 was not inclined to limit the times when parents could call and instead would take calls at the parents' convenience. Dr. Brown became irritated and told Mr. Reed that they needed "to get this right" because "this is going to come back to me and you" and "you and I are the ones who are going down for this." Dr. Brown further expressed concern that K12 was trying to distance itself from her. On several occasions Dr. Brown asked Mr. Reed if K12 was directing him to be unsupportive of her suggestions. In addition, following the parent inquiries to the Agora Board and complaints to the PDE, Dr. Brown, on several occasions complained to Mr. Corcoran about "K12 being behind all of this."

167. On March 3, 2009, Mr. Reed expressed his concerns regarding Dr. Brown's attempts to coerce a "united front" to two K12 executives:

> Dr. Brown informed me today that she would like to meet with me next Monday to prepare for their visit. From my ongoing discussions with her, Dr. Brown wants to make sure "we're on the same page" and are showing a "united front" when PDE reps come to visit. She also remarked that she doesn't want them to "divide us." One particular item she wants us to create is a "communication plan" to show PDE how we respond to parent concerns and issues. While this is not a problem per se, I did tell her that Agora's [K12] leadership team and staff are always accessible to parents and feel that they provide ongoing feedback to parents as needed. Based on my response, I sensed strong concern from Dr. Brown that this somehow showed that we were trying to separate us and them. The issue was resolved and we will move forward with the communication plan and Monday's meeting as I do not want to hinder our relationship with her and the board.

(A true and correct copy of the 3/3/2009 email is attached hereto as Exhibit 42.)

168. For about 4 to 6 weeks between March and April 2009, the PDE conducted an extensive and comprehensive audit of Agora's academic, administrative, financial, and operational records and processes. The PDE worked exclusively and directly with K12 to collect documents and to answer questions regarding the management and operation of a cyber charter school. During this time period, Dr. Brown regularly called Mr. Corcoran for updates regarding the progress of the audit, and often reminded Mr. Corcoran of the importance of K12 and Cynwyd presenting a "united front" to the PDE auditors.

## The Agora Board And Its Failure To Promote The Interests Of Agora Students

169. Under 24 P.S. 17-1715-A(11), the members of the Agora Board are public officials whose single purpose is to promote the interest of Agora students. Under the Pennsylvania Public Official and Employee Ethics Act (the "Ethics Act"), members of the Agora

Board are "public officials." The Ethics Act serves two purposes: (1) to prohibit certain conduct, like conflicts of interest; and (2) to require disclosure of financial interests so that the public can see for itself by whom an official or employee may be influenced. Pursuant to the Ethics Act, Dr. Brown and members of the Agora Board were required to complete annual statements of financial interest which included disclosure of any source of income over $1,300 in the aggregate, any loans over $6,500, any gift of more than $250 in the aggregate, and any office, directorship or employment of any nature whatsoever in any business entity.

170.     As set forth below, upon information and belief, many members of the Agora Board had personal, familial and/or financial relationships with Dr. Brown that rendered the majority of the Board members incapable of independently carrying out their fiduciary duties to Agora. K12's discovery directed to Agora Board members likely will lead to the uncovering of additional conflicts of interest, but based on K12's current information, these conflicts include, but are not limited to, the following:

a)     Kathleen Suloff is employed as an administrator at the Laboratory, a school associated or affiliated with Dr. Brown, and was a member of the Strategic Planning Committee for Ad Prima Charter School ("Ad Prima"), a school associated or affiliated with Dr. Brown.

b)     Edward Caruso is the principal of Caruso & Associates. Mr. Caruso and/or his company brokered coverage for the General Liability and Commercial Umbrella policy for Devon Site while Mr. Caruso was a Board member. On November 9, 2007 and October 24, 2008, Mr. Caruso faxed to Agora invoices for payment. (True and correct copies of the 11/9/07 and 10/24/08 faxes and invoices are attached hereto as Exhibits 43 and 44.) Cynwyd prohibited Mr. Corcoran from seeking comparable or better bids for coverage of the Devon Site.

c)     Anthony Smoot is employed as a business manager of one or more charter schools affiliated or associated with Dr. Brown. On May 22, 2008, the *Philadelphia Inquirer* reported that Mr. Smoot was being investigated by PPSERS for receiving salaries from multiple charter schools for alleged full-time work. (See Exhibit 32.)

d)     Myra Corbin Smoot was the President of Ad Prima Board for the 2007-2008 academic year, and the Secretary of Planet Abacus Board for the 2007-2008 academic year. Ad Prima and Planet Abacus are associated or affiliated with Dr. Brown.

e)     Arnita Medley is employed by one or more charter schools associated or affiliated with Dr. Brown.

f)     Courtney Knight has been employed by and on the board of one or more charters schools associated or affiliated with Dr. Brown. For instance, Mr. Knight served on the Strategic Planning Committees of Ad Prima and Laboratory, two schools associated or affiliated with Dr. Brown.

g)     Lisa Cabugcal was the Vice President of the Ad Prima Board for the 2006-2007 academic year. Ad Prima is associated or affiliated with Dr. Brown.

h)     Joan Chalker, Ed.D. is the CEO of Planet Abacus Charter School ("Planet Abacus"), and serviced on the Strategic Planning Committees of Ad Prima and Laboratory. Planet Abacus, Ad Prima and Laboratory are schools associated or affiliated with Dr. Brown.

i)     John Goulding is a former member of the Strategic Planning Committees of Laboratory and Planet Abacus, two schools associated or affiliated with Dr. Brown.

j)     Gladys Lassiter is a former Secretary of the Laboratory Board, a school associated or affiliated with Dr. Brown.

**PDE's Decision to Place Agora's Funds in Escrow**

171.     Following a comprehensive audit of Agora's financial, administrative, operational, and governance records, on April 29, 2009, the PDE advised K12, as the administrator of Agora's Operating Account, that it had placed Agora's funds in escrow, and ordered K12 not to make any disbursements from Agora's Operating Account without the authorization of the Secretary of Education.

172.     K12 has complied with the PDE's instruction and has not processed the payment of any management fees, including the fees to which it is entitled.

173.     Immediately following the PDE's decision to place Agora's funds in escrow, Dr. Brown told Mr. Corcoran and Mr. Reed on several occasions that "I have a surprise for K12." In light of Dr. Brown's lawsuits against K12 and the PDE, and the unwarranted and baseless criticism directed at K12 since the PDE decided to withhold funding, it is now apparent that her "surprise" was to file meritless claims against K12.

174.     Immediately prior to and following the PDE's decision to place Agora's funds in escrow, Dr. Brown, on behalf of the Agora Board, made several efforts to obtain counsel and cash for the Agora Board.

175.     On April 20, 2009, Dr. Brown called Mr. Corcoran and asked him how the Board could obtain money to hire legal counsel. Mr. Corcoran advised Dr. Brown that he would need to receive approval from the Board for any such disbursement. Dr. Brown then told Mr. Corcoran that the Board was upset that it did not have its own "pot" of money and inquired with Mr. Corcoran regarding a separate bank account for the Agora Board. Mr. Corcoran, a former auditor for a public accounting firm, told Dr. Brown that he thought a separate account was inappropriate given the risk of weakened internal controls over expenditures as well as the intense public scrutiny under which the school was already operating.

176.     On April 27, 2009, Dr. Brown visited Mr. Corcoran at Agora's office to discuss a variety of matters. During the visit, Dr. Brown told Mr. Corcoran that "the Board will be sending you a note directing you to send them money so they can retain an attorney." Mr. Corcoran responded to Dr. Brown by reiterating his concerns about establishing a separate bank account or attempting to require Mr. Corcoran to send the Agora Board cash to retain counsel, and asked again to speak directly to the Board about this. Dr. Brown told Mr. Corcoran that she agreed with him, and that she would advise the Board of the same.

177.    On May 1, 2009, Agora Board member Mr. Caruso telephoned Mr. Corcoran and told him that he had received a phone call from Dr. Brown at 7:30 p.m. the previous evening. According to Mr. Caruso, Dr. Brown stated that "we are having an emergency Board meeting right now, and I need your vote to hire an attorney for the Board."

178.    On May 6, 2009, the Agora Board's counsel submitted an invoice to K12 requesting payment in the amount of $100,000. (A true and correct copy of the 5/6/09 invoice is attached hereto as Exhibit 45.) Although the invoice states that the requested payment was authorized by a resolution of the Agora Board, it did not attach a copy of the Agora Board's duly executed resolution.

179.    As required by the PDE, K12 sought the PDE's approval of the invoice, which approval the PDE denied. As a result of the PDE's instruction, K12 did not pay the invoice.

180.    By letter dated June 11, 2009, the PDE notified the Agora Board of the results of the PDE's and LECS's investigation of Agora and advised the Agora Board of its findings: "(1) The Agora Board of Trustees violated its Charter by retaining an outside educational management company; (2) The Agora Board of Trustees failed to comply with the Charter School; and (3) The Agora Board of Trustees violated its bylaws." (A true and correct copy of the 6/11/2009 Ltr. is attached hereto as Exhibit 46.) The PDE further advised the Board that there were adequate grounds to revoke or not renew Agora's Charter, and that "[t]wo actions" by the Board of Trustees of Agora Cyber Charter School's within ten (10) days from the date of that letter could remedy these violations: "(1) The Board of Trustees must be replaced with Trustees approved by the Department who have no personal, familial and/or financial relationships with June Brown. (2) The Board of Trustees must terminate its contract with the

Cynwyd Group as the Charter prohibits Agora from retaining an educational management company to manage the school."

181.   The Agora Board elected not to comply with the actions requested by the PDE in the June 11, 2009 letter.

182.   On June 22, 2009, the PDE notified Agora of revocation and non-renewal charges against Agora.  (A true and correct copy of the charges is attached hereto as Exhibit 47.)

**Dr. Brown's and Agora Board's Multi-Pronged Conspiracy to Take Down K12 and Agora**

183.   Following PDE's revocation notice, Dr. Brown and the Board promptly executed their multi-pronged plan to circumvent the PDE Order and obtain money for Dr. Brown.

184.   On June 25, 2009, Agora sued the PDE, the Pennsylvania Office of the Budget ("POB") and each department's respective Secretary.  (A true and correct copy of the Agora Complaint, without attachments, against PDE and POB is attached hereto as Exhibit 48.) While not directly relevant to Agora's claims against PDE and POB, Agora makes a number of allegations against K12.  Agora alleges that K12 "was most interested in dramatically growing the number of students at Agora (and thereby growing K12's revenues at Agora) at a rapid pace . . . which Agora believed was not necessarily in the best interests of Agora, its teachers and students."  (Agora/PDE Complaint at ¶ 29.)  Agora also alleges that it and Cynwyd "regularly clashed with K12" . . . with Agora and Cynwyd trying to moderate Agora's growth to ensure that the Agora students would receive the quality of education and student-teacher ratios that they expected and deserved from Agora."  (Id. at ¶ 31.)  Later in the Complaint, Agora alleges that PDE and K12 are conspiring together to displace the Agora Board and Cynwyd.  Agora alleges that "K12 has designs upon becoming the exclusive educational management company for all 11

cyber charter schools in Pennsylvania," (id. at ¶ 84), and has engaged in "extensive lobbying, political efforts and otherwise to be named the commonwealth's exclusive education management company for cyber charter schools in the Commonwealth, including at Agora." (Id. at 86.)  At Count VIII of the Complaint, Agora explicitly alleges that K12 and PDE have engaged in a civil conspiracy "to eliminate Cynwyd and the Agora Board from the operation and management of Agora, and to replace Cynwyd and the Agora Board with K12 and/or PDE's hand-picked board members." (Id. at ¶ 167.)  While Agora does not seek any damages from K12 or name K12 as a defendant, Agora seeks monetary and injunctive relief from PDE and POB. Specifically, Agora requests that all federal funds that are "due and owing to Agora" be released to Agora and that PDE and its Secretary are enjoined from proceeding with Charter proceedings against Agora.

Agora, however, has demonstrated that it will twist its allegations to suit its purpose.  For example, in its most recent filing with the Court, Agora takes credit for the growth of Agora's student population as proof of the benefit of the services it, through K12, has provided.

185.    On June 29, 2009, Agora filed a complaint against K12 in Chester County demanding an accounting of the amount of money K12 has paid on Agora's behalf.  (A true and correct copy of this petition is attached hereto as Exhibit 49.)

186.    On June 29, 2009, Agora commenced an action in Pennsylvania Commonwealth Court seeking appellate review of the PDE's decision to withhold funds from Agora.  K12 is not named as a respondent to this petition.  (A true and correct copy of this petition is attached hereto as Exhibit 50.)

187.    Fourth, and finally, Cynwyd has sued K12 in this Court, alleging breach of contract.

## COUNT I

## BREACH OF CONTRACT
### (Against Cynwyd and Dr. Brown Individually)

188.    K12 restates and incorporates by reference paragraphs 1 through 187 above as if set forth in full herein.

189.    Dr. Brown is, and at all times relevant hereto has been, the alter ego of Cynwyd.  As the sole owner of Cynwyd, she ignored Cynwyd's status as a separate corporate entity and dominated and controlled its affairs such that its separate corporate existence was a sham.

190.    Cynwyd and Dr. Brown, individually and as the alter ego of Cynwyd, knowingly and voluntarily entered into the Cynwyd/K12 Agreement, which is a valid and enforceable agreement under Pennsylvania law.

191.    Cynwyd and Dr. Brown, individually and as the alter ego of Cynwyd, have breached their duties under the Cynwyd/K12 Agreement, including, but not limited to:

    a)    the duty to perform their obligations in a manner consistent with applicable law and the agreements and charters permitting Agora to operate a cyber charter school (§ 1.01(i));

    b)    the duty to ensure K12's right and access to payment of specified fees (§ 5).

192.    K12 has performed all of its material obligations under the Cynwyd/K12 Agreement.

193.    As a result of Cynwyd's and Dr. Brown's breaches of contract, K12 has suffered irreparable harm and incurred significant actual and consequential damages, including

but not limited to the amounts the PDE has withheld from K12 while the revocation proceedings are continuing and the costs incurred defending its interests in multiple litigations.

WHEREFORE, K12 respectfully requests that the Court enter judgment in its favor and against Cynwyd and Dr. Brown individually, jointly and severally, and order Cynwyd and Dr. Brown to fully reimburse K12 for all damages occasioned by their breaches of contract, including interest, costs, consequential damages, and all other relief the Court deems just and proper.

## COUNT II

## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (Against Cynwyd and Dr. Brown Individually)

194.    K12 restates and incorporates by reference paragraphs 1 through 193 above as if set forth in full herein.

195.    Pursuant to the Cynwyd/K12 Agreement and Pennsylvania law, Cynwyd and Dr. Brown, individually and as Cynwyd's alter ego, owed K12 a duty of good faith and fair dealing in the execution of the Cynwyd/K12 Agreement.

196.    Cynwyd and Dr. Brown, individually and as the alter ego of Cynwyd, have breached their duties duty of good faith and fair dealing with respect to the provisions of the Cynwyd/K12 Agreement, including but not limited to those described in paragraph 191 above.

197.    K12 has performed all of its material obligations under the Cynwyd/K12 Agreement.

198.    As a result of Cynwyd's and Dr. Brown's breaches of their duties of good faith and fair dealing, K12 has suffered irreparable harm and incurred significant actual and

consequential damages, including but not limited to the amounts the PDE has withheld from K12 while the revocation proceedings are continuing and the costs incurred defending its interests in multiple litigations.

WHEREFORE, K12 respectfully requests that the Court enter judgment in its favor and against Cynwyd and Dr. Brown individually, jointly and severally, and order Cynwyd and Dr. Brown to fully reimburse K12 for all damages occasioned by the breach of their duties of good faith and fair dealing, including attorneys' fees, interest, costs, consequential damages, and all other relief the Court deems just and proper.

## COUNT III

## BREACH OF CONTRACT
## (Against Agora)

199.    K12 restates and incorporates by reference paragraphs 1 through 198 above as if set forth in full herein.

200.    K12 is an intended beneficiary of the Management Agreement, which is a valid and enforceable agreement under Pennsylvania law. In the Management Agreement, which references the Cynwyd/K12 Agreement in numerous sections and is attached as Schedule 1 thereto, Agora and Cynwyd expressly recognized that K12 would perform services with respect to the operation of the school for which K12 would be compensated. (See Management Agreement, §§ 1, 3, 8 and Schedule 1 (Ex. A. to Compl.).)

201.    As an intended beneficiary of the Management Agreement, K12 is entitled to enforce the provisions thereof.

202.    Agora, through the conduct of its Board, has breached its duties under the Management Agreement, including but not limited to:

<ol type="a">
<li>its duty to refrain from taking action that causes any governmental authority with jurisdiction over the operation of the school to institute any proceedings for the suspension, rescission or revocation of any necessary charter, license, permit or approval and to refrain from taking action that will adversely affect the school's right to obtain payment from the PDE or other programs (§§ 9.1-9.2);</li>
<li>its duty to ensure the school complies with applicable law and the Charter School/Sponsor Agreement (§ 9.3); and</li>
<li>its duty to operate and maintain the school in accordance with applicable law (§ 15.1).</li>
</ol>

203. As a result of Agora's breach of contract, K12 has suffered irreparable harm and incurred significant actual and consequential damages, including but not limited to the amounts the PDE has withheld from K12 while the revocation proceedings are continuing and the costs incurred defending its interests in multiple litigations.

WHEREFORE, K12 respectfully requests that the Court enter judgment in its favor and against Agora, and order Agora to fully reimburse K12 for all damages occasioned by its breach of contract, including interest, costs, consequential damages, and all other relief the Court deems just and proper.

## COUNT IV
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
### (Against Agora)

204. K12 restates and incorporates by reference paragraphs 1 through 203 above as if set forth in full herein.

205. As set forth in paragraphs 200 and 201 above, K12 is an intended beneficiary of the Management Agreement and is entitled to enforce the provisions thereof.

206.    Pursuant to the Management Agreement and Pennsylvania law, Agora and its Board of Trustees owed K12 a duty of good faith and fair dealing in the execution of Agora's obligations under the Management Agreement.

207.    Agora, through the conduct of its Board of Trustees, has breached its duty of good faith and fair dealing with respect to the provisions of the Management Agreement, including but not limited to those described in paragraph 202, by failing to undertake its obligations in good faith.

208.    As a result of Agora's breach of its duty of good faith and fair dealing, K12 has suffered irreparable harm and incurred significant actual and consequential damages, including but not limited to the amounts the PDE has withheld from K12 while the revocation proceedings are continuing and the costs incurred defending its interests in multiple litigations.

WHEREFORE, K12 respectfully requests that the Court enter judgment in its favor and against Agora and order Agora to fully reimburse K12 for all damages occasioned by its breach of its duty of good faith and fair dealing, including attorneys' fees, interest, costs, consequential damages, and all other relief the Court deems just and proper.

## COUNT V

## ABUSE OF PROCESS
### (Against Cynwyd and Dr. Brown Individually)

209.    K12 restates and incorporates by reference paragraphs 1 through 208 above as if set forth in full herein.

210.    By instituting this lawsuit, Cynwyd and Dr. Brown have used a legal process against K12.

211.    Cynwyd and Dr. Brown instituted these legal proceedings against K12 primarily for purposes for which they were not intended.  Specifically, Cynwyd instituted these

proceedings, and among many other things, to harass K12, to make good on Dr. Brown's threats against K12, to tarnish K12's reputation, to force K12 to expend time and resources defending itself, and as part of a concerted effort to undermine the PDE's authority, compel the payment of fees that the PDE disputes are due and owing to Cynwyd, and for the purpose of subjecting K12 to unwarranted civil litigation.

212. Cynwyd's and Dr. Brown's conduct has been intentional, outrageous, and recklessly indifferent to K12's rights.

213. As a result of these actions, K12 has suffered and will continue to suffer damages and irreparable harm, including, but not limited to, the incurring of significant litigation expenses.

WHEREFORE, K12 respectfully requests that the Court enter judgment in its favor and against Cynwyd and Dr. Brown individually, jointly and severally, and order Cynwyd and Dr. Brown to fully reimburse K12 for all damages occasioned by their abuse of process, including punitive damages, attorneys' fees, interest, costs, consequential damages, and all other relief the Court deems just and proper.

## COUNT VI

### CIVIL CONSPIRACY FOR ABUSE OF PROCESS
### (Against Cynwyd and Dr. Brown Individually)

214. K12 restates and incorporates by reference paragraphs 1 through 213 above as if set forth in full herein.

215. Through the institution of four-pronged litigation strategy, and by maintaining this strategy in order to attempt to compel the PDE to pay the amounts Cynwyd demands, Cynwyd, Dr. Brown, and members of the Agora Board joined and continue to join together with the purpose of subjecting K12 to unwarranted civil litigation.

216. Cynwyd, Dr. Brown, and members of the Agora Board each understood that this objective would be achieved in part through the institution of lawsuits.

217. Members of the Agora Board, many of whom have long-standing financial and personal relationships with Dr. Brown, each conspired with Cynwyd and Dr. Brown to commit abuse of process by initiating this lawsuit. Their conduct in this regard has been outside the scope of their authority as Agora Board members, has been wholly unrelated to the performance of their obligations to Agora, and has been done intentionally for personal reasons and in further of personal relationships.

218. As detailed above, Cynwyd, Dr. Brown, and members of the Agora Board took overt acts in furtherance of their agreement, including initiating lawsuits against K12 in Chester County and this Court and making false or misleading statements or allowing false or misleading statements to be attributed to them intentionally or, at the very least, recklessly.

219. Cynwyd and Dr. Brown's conduct has been intentional, outrageous, and recklessly indifferent to K12's rights.

220. As a result of these actions, K12 has suffered and will continue to suffer damages and irreparable harm, including, but not limited to, the incurring of significant litigation expenses.

WHEREFORE, K12 respectfully requests that the Court enter judgment in its favor and against Cynwyd and Dr. Brown individually, jointly and severally, and order Cynwyd and Dr. Brown individually to fully reimburse K12 for all damages occasioned by their civil conspiracy, including punitive damages, attorneys' fees, interest, costs, consequential damages, and all other relief the Court deems just and proper.

Henry E. Hockeimer, Jr. (Pa I.D. No. 86768)
hockeimerh@ballardspahr.com
John C. Grugan (Pa I.D. No. 83148)
gruganj@ballardspahr.com
Lisa M. Cuifolo (Pa. I.D. No. 93753)
cuifolol@ballardspahr.com
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999

Attorneys for Defendant, Counterclaim Plaintiff,
and Third Party Plaintiff K12 Pennsylvania L.L.C.

Dated: August 10, 2009

## CERTIFICATE OF SERVICE

I, Lisa Cuifolo, hereby certify that, on August 10, 2009, I served Defendant's

Answer to Plaintiff's Complaint, Counterclaims Against Plaintiff, and Third Party Complaint,

upon counsel identified below, via the ECF system:

Clifford E. Haines
Haines & Associates
1835 Market Street, Suite 2420
Philadelphia, PA 19103
215-246-2200
*Counsel for The Cynwyd Group, L.L.C.*

Dated: August 10, 2009

Lisa Cuifolo